13960

GRIMBALL v. BEATTIE, COMPTROLLER GENERAL, *ET AL.*

(177 S. E., 668)

*Messrs. Nicholls, Wyche & Russell,* for petitioner

*Messrs. John M. Daniel, Attorney General, and J. Ivey Humphrey and J. Ingram Wilson, Assistant Attorney Generals,,* for respondents,

December 7, 1934. Per Curiam.

The petitioner, W. H. Grimball, brings this proceeding in the original jurisdiction of the Supreme Court, praying

for order of mandamus to require A. J. Beattie, as comptroller general of the state of South Carolina, to issue to him a salary warrant in the sum of $242.50, which petitioner alleges is the unpaid balance of his compensation as Circuit Judge for the month of August, 1934. Petitioner further asks judgment that Eustace P. Miller, as treasurer of the state of South Carolina, be required by order of this Court to pay such warrant when so issued.

A study of the petition filed and of the return made on behalf of the respondents discloses the following undisputed facts:

That the petitioner, W. H. Grimball, was elected, commissioned, and qualified as Circuit Judge of the Ninth Judicial Circuit of South Carolina in January, 1933, for a term of four years; at the time of his election his compensation as fixed by the Code of Laws of South Carolina was $7,500.00 per annum. From this compensation he was required to pay his traveling and living expenses while engaged in holding the Circuit Courts in various counties of the State.

On the 1st day of September, 1934, he presented to the respondent, A. J. Beattie, as comptroller general of the State of South Carolina, a requisition for salary warrant for one-twelfth of the sum of $7,500.00 claiming this as his compensation as Circuit Judge for the month of August, 1934, as fixed by Section 41 of the Code of Laws of South Carolina 1932. See Act Jan. 28, 1929 (36 St. at Large, p. 7), entitled "An Act to Fix the Compensation and to Provide for the Expenses of the Judges of the Circuit Courts."

The respondent, A. J. Beattie, as comptroller general, refused to issue a warrant to petitioner, according to the requisition, on the ground that it was not in accordance with the provisions of the annual appropriation Act of 1934, and therefore issued to petitioner a warrant for only $382.50.

It is admitted by the parties to the proceeding that there is a surplus in the hands of the treasurer of the State of South Carolina amounting to approximately $400,000.00.

The issues raised by the pleadings apparently cover a narrow sphere, but the spendid briefs presented by counsel for petitioner and respondents disclose that far-reaching questions of law are involved, not only as affecting the constitutional provisions invoked here, but as affecting the very basis on which the Constitution of the United States and that of the State of South Carolina was founded.

In the beginning, let us say, we fully realize the gravity of declaring under any circumstances an Act of the Legislature, a co-ordinate branch of the government, to be invalid, yet here we are called on to decide whether the appropriation Act of 1934 renders invalid the provisions of Section 41, Code of Laws South Carolina, 1932, and whether or not the claim of petitioner is protected by Section 9, Art. 5, of the Constitution of South Carolina 1895, which declares: "The Justices of the Supreme Court and Judges of the Circuit Court shall each receive compensation for their services to be fixed by law, which shall not be increased or diminished during their continuance in office."

Generally speaking, petitioner claims that since, at the time of his election in the month of January, 1933, his compensation was fixed by law at $7,500.00 per annum, any act of the Legislature which had for its purpose or the result of which would amount to a change in his compensation during his term of office is contrary to, and prohibited by, the Constitution of this State, and that the Legislature, being forbidden by the State Constitution to change his salary during his tenure of office, could not indirectly accomplish this purpose by providing in its annual appropriation act an amount of salary less than that fixed by law at the time petitioner was elected and commissioned a Circuit Judge.

The respondents, however, claim that there has been no appropriation made by law as required by the provisions of the State Constitution which would authorize them to pay the amount claimed by the petitioner.

To sustain this contention they rely upon Section 9, Art. 10, Constitution of South Carolina 1895, which provides that "money shall be drawn from the Treasury only in pursuance of appropriations made by law."

Now, unless there has been an appropriation made by law authorizing the payment of the salary claimed by petitioner, the comptroller general should not issue his warrant for the amount. The vital question before this Court is: Has there been an appropriation made by law to pay the salary claimed by Judge Grimball?

The provisions of Section 9, Art. 5, of the Constitution of South Carolina, as quoted above, seem clear and susceptible of only one construction, and that is, that the compensation of the Judges of the Supreme Court and of the Circuit Courts of South Carolina "shall not be increased or diminished during their continuance in office."

Three important questions seem to be presented by petitioner, and may be considered as follows: (1) That there is a constitutional appropriation, and his contention should be sustained under the authorities relied on; (2) that Section 41 of the Code of Laws South Carolina, 1932, passed pursuant to the terms and requirements of Section 9, Art. 5, of the State Constitution, quoted above, is a continuing statute, has never been repealed, and therefore his contention should be sustained on this ground; (3) that an appropriation bill cannot be used as a vehicle to repeal a continuing statute which was of force at the time of the election and qualification of the members of the judiciary.

It is a satisfaction to this Court to know that our own Supreme Court has heretofore passed upon some of these important questions, and as was said by Mr. Justice Woods, one of the great jurists of the past, in the case of *State ex rel., Buchanan v. State Treasurer,* 68 S. C., 411, 47 S. E., 683, 685; "As already indicated, if Judge Buchanan had been elected before November 1, 1893, he would have been entitled to a salary of $3,500.00

per annum for his entire term, notwithstanding that might have been intended to be the salary only during the currency of the appropriation bill, for the reason that the salary with which he entered office could not be lessened. But he was elected and qualified in December, 1894, after the end of the fiscal year, and after the reduction act went into effect."

In the case of *Brooks v. Jones,* 80 S. C., 443, 61 S. E., 946, our Supreme Court declared an annual appropriation act could not operate to suspend or repeal a permanent salary act, if such appropriation act was in violation of a constitutional inhibition, and said: "If an appropriation act appears to increase or diminish the salary provided in a permanent salary act, *the former controlls* (if there be no constitutional prohibition violated)."

This case in effect decides that the Legislature, being prohibited by the State Constitution to change the salary of a Circuit Judge during his tenure of office, could not indirectly accomplish this purpose by providing in its annual appropriation act an amount of salary less than that fixed by law at the time petitioner was elected and commissioned Circuit Judge.

From the foregoing decisions, it is clear that an annual appropriation bill cannot by its terms reduce the compensation of a Circuit Judge whose salary has theretofore been fixed by a continuing statute, which statute was in effect at the time of his election to office.

It is of importance to observe here that there is no provision in the State Constitution requiring legislative appropriations annually to make funds in the treasury available for the payment of the expenses of the government.

We here call attention to the pertinent sections of the State Constitution and of the statutes of South Carolina before us in this controversy.

Section 13, Art. 5, of the State Constitution, provides for the office of circuit Judge in the following language: "The

State shall be divided into as many Judicial Circuits as the General Assembly may prescribe, and for each Circuit a judge shall be elected by joint *viva voce* vote of the General Assembly, who shall hold his office for the term of four years."

The General Assembly by Section 50, Code of Laws of South Carolina 1932, divided the state into fourteen judicial circuits.

Section 9, Art. 5, of the State Constitution provides: "The Justices of the Supreme Court and Judges of the Circuit Court shall each receive compensation for their services to be fixed by law, which shall not be increased or diminished during their continuance in office."

Section 9, Art. 10, of the Constitution of South Carolina, relied on by respondents, provides that "money shall be drawn from the Treasury only in pursuance of appropriations made by law."

As required by this provision of the Constitution, the Legislature, by Section 41, Code of Laws of South Carolina 1932, fixed the compensation of Circuit Judges in the following language: "The annual salaries of the Judges of the Circuit Courts * * * shall be seven thousand five hundred ($7,500.00) dollars, each. * * *"

Section 3190, Code of Laws of South Carolina 1932, provides that salaries of State officers shall be paid in monthly installments.

Sections 3140 and 3141, Code of Laws South Carolina 1932, prescribe the manner of payment by the State Treasurer.

Section 3212, Code of Laws South Carolina 1932, provides that the constitutional officers shall be paid at the rate specified in the statutes for the term for which they have been elected.

Petitioner contends that an appropriation may be made by law through the provisions of a state Constitution, and relies on the following cases, which will be more fully

hereinafter discussed: *State ex rel. Buchanan v. State Treasurer,* 68 S. C., 411, 47 S. E., 683; *Thomas v. Owens,* 4 Md., 189; *State v. Hickman,* 9 Mont., 379, 23 P., 740, 8 L. R. A., 403; *Carr v. State,* 127 Ind., 204, 26 N. E., 778, 11 L. R. A., 370, 22 Am. St. Rep., 624; *Riley v. Carter,* 165 Okl., 262, 25 P. (2d), 666, 669, 88 A. L. R., 1018.

In the case of *Riley v. Carter,* just above cited and relied on by the petitioner and respondents, the Supreme Court of Oklahoma, in construing constitutional provisions similiar to those in the State Constitution of South Carolina, held that, when the Constitution of the state provided that the salaries of judges should be fixed by a statute, which salary should not be diminished during their term of office, and a statute was passed in conformity with such constitutional provision, a constitutional appropriation resulted, the payment of which was properly enforceable by writ of mandamus. The respondents assert that this case is not analogous to that before the Oklahoma Court. The basis upon which they urge this distinction is that the constitutional provisions of Oklahoma referred to, by specified terms, fixed the salary of the members of the Supreme Court of that state, one of whom brought the mandamus proceedings under consideration by that Court. However, the salary of the members of its Supreme Court at $7,500.00 per year, which salary was fixed by the provision of the Constitution, subject to the right of the Legislature subsequently to change the same. Following the adoption of the Constitution, the Legislature of Oklahoma fixed the salary of the members of its Supreme Court at $7,500.00 per year, and it was this salary that the petitioner in the case cited sought to require the payment of. His salary thus was not fixed by the Constitution, but was fixed by a statute passed just as Section 41 of our Code of Laws, pursuant to a constitutional warrant and mandate thereof, and under the view of this Court the case cited is authority for the conclusion that Section 41 of our Code of

Laws, construed in conjunction with the provisions of Section 9, Art. 5, of the State Constitution of South Carolina, constitutes a constitutional appropriation of petitioner's salary in the amount of $7,500.00 per year.

It will be noted that the framers of our State Constitution used the words "Judges of the Circuit Court *shall receive* compensation for their services *to be fixed* by law, which shall not be increased or diminished during their continuance in office." The words "to be fixed" themselves denote permanency. The words "shall receive" constitute words used in appropriating moneys. There is therefore great force in the reasoning of the Supreme Court of Oklahoma in the case of *Riley v. Carter* to impel the conclusion that the provisions of Section 9, Art. 5, of our State Constitution, construed with the statutory provisions in the Code of Laws, 1932, constitute a constitutional appropriation of petitioner's salary in the amount of $7,500.00 per annum.

An appropriation may also be made by a permanent continuing statute. *State ex rel. Buchanan v. State Treasurer,* 68 S. C., 411, 47 S. E., 683; *Scroggie v. Scarborough,* 162, S. C., 218, 160 S. E., 596; *State v. Derham,* 61 S. C., 258, 39 S. E., 379; *Brooks v. Jones,* 80 S. C., 443, 61 S.E., 946; 36 Cyc., 893; *Nichols v. Comptroller,* 4 Stew. & P. (Ala.), 154; *Renolds v. Taylor,* 43 Ala., 420; 59 C. J., 261; *State ex rel. Henderson v. Burdick,* 4 Wyo., 272, 33 P., 125, 24 L. R. A., 266; *People ex rel. Hegwer v. Goodykoontz,* 22 Colo., 507, 45 P., 414; *State ex rel. Davis v. Eggers,* 29 Nev., 469, 91 P., 819, 16 L. R. A. (N. S.), 630, and case notes: *Menefee v. Askew,* 25 Okl., 623, 107 P., 159, 27 L. R. A. (N. S.), 537, and case notes; *State ex rel. Birdzell v. Jorgensen,* 25 N. D., 539, 142 N. W., 450, 49 L. R. A. (N. S.), 67, and case notes.

The only limitation in our State Constitution is that money shall be drawn from the treasury only in pursuance of appropriations made by law. Section 9, Art. 10, State Constitution.

It will be seen that the Constitution prohibits any money being paid out of the State treasury except in pursuance of an appropriation made by law. It is significant that the framers of our Constitution did not require that appropriations be made by an annual appropriation act. The provisions of the Constitution do not require any arbitrary form of expression or particular words in making an appropriation. No particular expression or set of words are requisite or necessary to carry out the provisions of the Constitution. The only limitation is that the appropriations must be made by law. The object of the constitutional provision prohibiting the payment of money from the State treasury, except by appropriations made by law, is to prohibit expenditures of the public funds, at the mere will and caprice of those having the funds in custody without legislative sanction therefor.

The State Constitution creates the office of Circuit Judge and prescribes the term of office (Section 13, Art. 5); directs the General Assembly to fix the salary; and prohibits it from changing it during his term of office (Section 9, Art. 5); the Legislature has fixed the amount of salary, together with the time and method of its payment (Sections 41, 3190, 3140, 3141, Code 1932), and directed that it shall be paid at the rate specified in the statutes for the term for which petitioner ·has been elected (Section 3212, Code 1932). All these sections are unrepealed and unmodified, and were in full force and effect during the month of August, 1934. Nothing is left indefinite or uncertain in the law. No further legislative sanction or action is necessary to authorize the proper officers to pay petitioner's salary. No other legislation or special appropriation Act at each annual session of the General Assembly is required to keep the statutes in question here alive and effective during the term of office of petitioner.

In the case of *State v. Derham,* 61 S. C., 258, 39 S. E., 379, 380, this Court declared in an opinion by Mr. Justice

Pope that: "We know of no law which confines the general appropriations in what is known as the act for general appropriations of any fiscal year, or to what is known as the act making appropriations to pay legislative expenses. It is competent, though unusual, for the general assembly to provide for appropriations of the public money by other acts than the two just mentioned. What is meant by the phrase 'legislative appropriations of money'? To appropriate money is to set it apart,—to designate some specific sum of money for a particular purpose or individual."

The decision in the case of *State ex rel. Henderson v. Burdick, supra,* cited with approval in the case of *State ex rel. Buchanan v. State Treasurer, supra,* is based upon constitutional provisions and statutes almost exactly the same as those of our own state. The opinion reviews at length the decisions from other jurisdictions upon the point, and in our opinion rightfully concludes that a permanent continuing statute fixing the compensation of a public officer is a valid appropriation for his salary.

In the case of *State ex rel. Buchanan v. State Treasurer, supra,* this Court agrees with the reasoning and conclusion reached in the case of *State ex rel. Henderson v. Burdick,* in the following language: "Assuming, however, that the petitioner is entitled to the amount claimed, we next consider whether any appropriation has been made from the state funds, for, as we understand, it is conceded that the Court can require money to be paid from the state treasury only when it has been appropriated by the Constitution or *a statute.* In article 2, § 22, of the Constitution of 1868, it is provided, 'No money shall be drawn from the treasury but in pursuance of an appropriation made by law.' [Article 10, § 9, Const. 1895]. * * *"

Continuing in the *Buchanan case* Judge Woods says:

*"Strong argument has been presented, also, in support of the proposition that, when the salary claimed is fixed by a permanent continuing statute, the actual right to which*

*omission from an annual appropriation act will not affect, no special current appropriation is necessary to entitle the claimant to payment. State ex rel. Henderson v. Burdick,* 4 Wyo., 272, 33 P., 125, 24 L. R. A., 266. But the petitioner cannot sustain the application for mandamus on this ground, for the reason that *here his claim does not rest on a continuing statute,* but on the temporary annual appropriation Act itself, which in terms limits the appropriation to a time which expired before the beginning of his term of office. In addition to this, there was not only an omission to appropriate and provide in the temporary statute the salary claimed, but an annual appropriation by the next General Assembly of a smaller amount than that claimed. So that the conclusion is inevitable that the legislative branch of the government, from which the appropriation must come, has practically declined to pay the larger salary by providing for the payment of a smaller. We think, therefore, there has been no appropriation of public funds for the payment of the amount demanded.

"*If there had been such appropriation,* it would be the obvious ministerial duty of the Comptroller General to issue his warrant, and of the Treasurer to pay it, and the Court would enforce this duty by mandamus."

In the opinion in this case, this Court in effect said that, if there had been an appropriation by a permanent continuing statute, no special current appropriation was necessary to entitle the claimant to payment, and it would be, under such circumstances, the obvious ministerial duty of the comptroller general to issue his warrant, and of the treasurer to pay it, and the court would enforce this duty by mandamus. See, also, *Briggs v. Greenville County,* 137 S. C., 288, page 299, 135 S. E., 153; *State v. Moorer,* 152 S. C., 455, page 485, 150 S. E., 269.

> While there is in force a general law fixing the amount of the salary of a public officer and prescribing its payment at particular periods, it is not

necessary, in order to authorize the Comptroller to issue the warrant on the Treasurer for the amount of such salary, that there should be a special annual appropriation. 36 Cyc., 893; *Nichols v. Comptroller,* 4 Stew. & P. (Ala.), 154; *Reynolds v. Taylor,* 43 Ala., 420; *State ex rel. Davis v. Eggers,* 29 Nev., 469, 91 P., 819, 16 L. R. A. (N. S.), 630, and case notes; *Menefee v. Askew,* 25 Okl., 623, 107 P., 159, 27 L. R. A. (N. S.), 537, and case notes; *State ex rel. Birdzell v. Jorgenson,* 25 N. D., 539, 142 N. W., 450, 49 L. R. A. (N. S.), 67, and case notes; 59 C. J., 261; *State ex rel. Henderson v. Burdick,* 4 Wyo., 272, 33 P., 125, 24 L. R. A., 266; *State ex rel. Hegwer v. Goodykoontz,* 22 Colo., 507, 45 P., 414, 415.

In the *State ex rel. Buchanan v. State Treasurer* case, *supra,* the Comptroller General and the State Treasurer contended that there were no funds in the State treasury upon which the Comptroller General could draw his warrant directing the Treasurer to pay such claim. In disposing of this contention this Court said: "If there had been an appropriation of the amount claimed, this defense would not avail, because it is not stated that there are no funds in the treasury, only that there are none applicable to this claim."

The respondent admits that the Treasurer has a surplus of funds sufficient to pay the amount here demanded. Such funds are applicable to the payment of petitioner's claim. Sections 3189, 3140, Code of Laws 1932; *State ex rel. Buchanan v. State Treasurer, supra.*

The case of *Walpole v. Wall,* 153 S. C., 106, 149 S. E., 760, 762, this Court disposes of the question in the following language: "The petitioner is a teacher in a high school, and the salaries of teachers in high schools are fixed by law. Section 2732, Vol. 3, Code of 1922. *'A salary fixed by law need not be audited.'* There is no discretion to be exercised, but the salary must be paid. *State ex rel. Marshall v. Starling,* 13 S. C., 262. When payment of salary is re-

fused, remedy by writ of mandamus is appropriate. *State ex rel. Marshall v. Starling, supra;* High on Extraordinary Remedies, 105."

The conclusion is therefore impelled that the provisions of the State Constitution creating the office of Circuit Judge, prescribing his term of office, commanding the manner of fixing his compensation, prohibiting the diminution thereof during his continuance in office, and the provisions of the permanent unrepealed, unmodified, operative statutes fixing the amount of his compensation, designating the time, mode, and manner of payment, directing that he shall be paid at the rate specified in the statutes for the term for which he has been elected, constitute an appropriation of petitioner's salary in the sum of $7,500.00 per annum, made by law, in accordance with the constitutional requirements, the payment of which by the Comptroller General and State Treasurer from the surplus funds in the State treasury is a simple ministerial act compellable by mandamus.

The respondents contend however, that, even though this Court should decide that the petitioner has shown a clear right to exist, entitling him to the writ of mandamus prayed for, this Court may, in the exercise of judicial discretion, refuse to grant the writ, knowing that the Legislature in its efforts to meet the economic condition existing at the time of the annual appropriation Act of 1934 reduced the appropriation for all State officers, and that in so doing the Legislature was simply recognizing the existence of a world-wide state of depression. It is perhaps true that this Court may, in the exercise of judicial discretion, refuse to issue the writ, even though the petitioner may have shown a clear, legal right for which mandamus is an appropriate remedy.

As we view the issues presented in this case, the fundamental law of South Carolina is involved. A determination of the questions presented must of necessity bring before us

the foremost declaration of our State Constitution and of our Federal Constitution that the legislative, the executive, and the judicial branches of our government must be independent and apart, and, in reviewing the decisions herein referred to, this Court reiterates the expressions handed down to us from the great jurists who sat upon the bench of the Supreme Court of the United States, to the effect that the judiciary must at all times be kept independent, and this especially insofar as it affects the living income provided for and to continue during the terms of office of the members of our Courts.

As Mr. Justice Van Devanter said, writing the opinion for the Supreme Court of the United States in the case of *Evans v. Gore,* 253 U. S., 245, 40 S. Ct., 550, 64 L. Ed., 887, 11 A. L. R., 519, and quoting from the syllabus: "Const. Art. 3, § 1, providing that Judges shall receive a compensation which shall not be diminished during their continuance in office, *imposes such limitation in the public interest* and not for the benefit of the Judges. * * * "

So it must be recalled also that the framers of our Constitution in their wisdom protected to the uttermost the independence of the legislative branch of our government and by Section 11, Art. 3, in said Constitution, provided: "Each house shall judge of the election returns and qualifications of its own members."

The judiciary can have no voice in the decisions of the legality of the election of members of the General Assembly, nor can it have any voice in their legal qualifications to be members of the General Assembly. These provisions were wisely placed in the Constitution of the United States and of South Carolina to keep the legislative bodies independent of the judiciary. The provisions in the Constitution that prohibit the General Assembly from diminishing a Judge's salary during his term of office are inserted in the Constitution to keep the judiciary independent of the General Assembly.

In a recent decision of the Supreme Court of the United States of *O'Donoghue v. U. S.,* 289 U. S., 516, 53 S. Ct., 740, 744, 77 L. Ed., 1356, Mr. Justice Sutherland speaking for the Court, employed the following language in stressing the importance of maintaining an independent judiciary: "In the light of the foregoing views—time honored and never discredited—it is not extravagant to say that there rests upon every Federal Judge affected nothing less than a duty to withstand any attempt, directly or indirectly in contravention of the Constitution, to diminish this compensation, not for his private advantage—which, if that were all, he might willingly forego—but in the interest of preserving unimpaired an essential safeguard adopted as a continuing guaranty of an independent judicial administration for the benefit of the whole people."

As is further hereinafter quoted, if the salaries of the Judges could be diminished during their term of office, a legislative body, if it saw fit, could in truth and fact enforce a resignation by reducing the compensation to such a sum as would make it impossible for him to exist on such an income.

As far back as 1788, the Judges of the Court of Appeals of Virginia, directed to the Members of the State Assembly a "respectful remonstrance" against an Act which had the effect of reducing their compensation, in which they said: "The propriety and necessity of the independence of the Judges is evident in reason and the nature of their office; since they are to decide between government and the people, as well as between contending citizens; and, if they be dependent on either, corrupt influence may be apprehended, sacrificing the innocent to popular prejudice; and subjecting the poor to oppression and persecution by the rich. And this applies more forcibly, to exclude a dependence on the Legislature; a branch, of whom, in cases of impeachment, is itself a party.  *  *  *  For vain would be the precautions of the founders of our government to secure liberty, if the

Legislature, though restrained from changing the tenure of judicial offices, are at liberty to compel a resignation by reducing salaries to a copper." In re Judges of Court of Appeals, 4 Call (Va.), 135, 143.

This contention of respondents may best be answered by employing the language in the decision of the Supreme Court of Oklahoma in the case of *Riley v. Carter, supra,* where the Court forcibly and conclusively disposes of the matter in the following convincing words:

"If it be assumed that the only reason for the placing of this provision in our Constitution was to make secure to the public officials of this State the receipt of the salary fixed at the time of their election, then the suggestion of the withholding of the writ by this Court would be entitled to the serious consideration of this Court, but this assumption overlooks the history of the reasons for the insertion of this and similar provisions in the constitutions of practically all of the States and the Constitution of the United States. As applied to the judicial department, the history of such provisions shows clearly that they were inserted in the various constitutions for the purpose of making absolutely independent the judicial branch of the government, * * * the evident purpose expressed in each is the continuation of separate and independent branches of government.

"It is a matter of judicial history that one of the abuses of the power of the King of England that resulted in the Revolution of 1688 was the abuse that followed the power of appointing and removing at will the Judges. To appreciate the evils that flowed from a dependent judiciary, we may well consult the experience of England as shown by their judicial history and experience during the Stuart Dynasty, when the judges held office at the pleasure of the king who appointed them and when they depended entirely upon the generosity of the appointing power for their compensation and the amount thereof, which resulted in the judges becoming but tools of the crown who made and unmade

them. Scroggs and Jeffrey are but representatives of such a system. Whole benches were appointed for the distinct purpose of carrying into effect some new or flagrant assumption of power by the crown, and they willingly obeyed the commands of the master and creator. Outraged by such a judicial subservience that followed a dependent judiciary, following the revolution, the people made the tenure of the judges good behaviour, and this was proclaimed by the people of England as a triumph of liberty, and changed the exercise and enjoyment of the inalienable rights of the people of England from an abstract right to one of complete enjoyment. It may well be said that this change of the tenure of judges in England marked the creation and beginning of an independent judiciary, and that as years have passed, the people of England and all other countries have learned the value and necessity of an independent judiciary and have in their constitutions and laws endeavored to provide for a continuation of the same. * * * "

The foregoing observations and references to the reasons why the framers of the Constitution of the United States limited the right of Congress to diminish compensation of Federal Judges during their tenure of office is further accentuated by the declarations of the Supreme Court of the United States in *Evans v. Gore,* 253 U. S., 245, 40 S. Ct., 550, 553, 64 L. Ed., 887, 11 A. L. R., 519, where the Court denied the right of Gore, as collector of internal revenue, to collect income tax on the salary of a Judge of the United States Court, and used the following pertinent language:

"These considerations make it very plain, as we think, that the primary purpose of the prohibition against diminution was not to benefit the judges, but, like the clause in respect of tenure, to attract good and competent men to the bench and to promote that independence of action and judgment which is essential to the maintenance of the guaranties, limitations, and pervading principles of the Constitution and to the administration of justice without respect to persons

and with equal concern for the poor and the rich. Such being its purpose, it is to be construed, not as a private grant, but as a limitation imposed in the public interest; in other words, not restrictively, but in accord with its spirit and the principle on which it proceeds.

"Obviously, diminution may be effected in more ways than one. Some may be direct and others indirect, or even evasive as Mr. Hamilton suggested. But all which by their necessary operation and effect withhold or take from the judge a part of that which has been promised by law for his services must be regarded as within the prohibition. Nothing short of this will give full effect to its spirit and principle."

Further clear approval of the findings of the Supreme Court of the United States in *Evans v. Gore, supra,* is found in O'*Donoghue v. United States,* 289 U. S., 516, 53 S. Ct., 740, 743, 77 L. Ed., 1356, where Mr. Justice Sutherland, speaking for the Court, again reiterates the principle which the founders of our government had in mind when the constitutional limitations here under discussion were originally made a part of the Constitution of the United States:

"In framing the Constitution, therefore, the power to diminish the compensation of the Federal Judges was explicitly denied, in order, *inter alia,* that their judgment or action might never be swayed in the slightest degree by the temptation to cultivate the favor or avoid the displeasure of that department which, as master of the purse, would otherwise hold the power to reduce their means of support. The high importance of the provision, as the contemporary history shows, was definitely pointed out by the leading statesmen of the time. Thus, in the Federalist, No. 78, Hamilton said: 'The complete independence of the Courts of justice is peculiarly essential in a limited Constitution.' And in No. 79: 'Next to permanency in office, nothing can contribute more to the independence of the judges than a

fixed provision for their support. \* \* \* In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.* (The italics are in the original.) \* \* \*

"In a very early period of our history, it was said, in words as true to-day as they were then, that 'if they (the people) value and wish to preserve their Constitution, they ought never to surrender the independence of their judges.' Rawle on the Constitution (2d Ed.) 281."

As early as 1862 (12 Stat., 472, § 86), an attempt was made by the Congress of the United States to place a tax of 3 per cent. on the salaries of all civil officers of the United States, including the compensation of the President and the Judges.

Chief Justice Taney at that time wrote to the Secretary of the Treasury a letter, protesting the right of the Secretary of the Treasury to collect this tax, and in part used the following language:

"The act in question, as you interpret it, diminishes the compensation of every Judge three per cent. and if it can be diminished to that extent by the name of a tax, it may in the same way be reduced from time to time at the pleasure of the Legislature.

"The Judiciary is one of the three great departments of the government, created and established by the Constitution. Its duties and powers are specifically set forth, and are of a character that requires it to be perfectly independent of the two other departments, and in order to place it beyond the reach and above even the suspicion of any such influence, the power to reduce their compensation is expressly withheld from Congress, and excepted from their powers of legislation.

"Language could not be more plain than that used in the Constitution. It is moreover one of its most important and essential provisions. For the articles which limit the powers of the legislative and executive branches of the govern-

ment, and those which provide safeguards for the protection of the citizen in his person and property, would be of little value without a judiciary to uphold and maintain them, which was free from every influence, direct or indirect, that might by possibility in times of political excitement warp their judgments.

"Upon these grounds I regard an act of Congress retaining in the Treasury a portion of the compensation of the judges, as unconstitutional, and void."

Chief Justice Marshall at the Virginia State Convention of 1829-30 said: "The Judicial Department comes home in its effects to every man's fireside; it passes on his property, his reputation, his life, his all. Is it not, to the last · degree important, that he should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience? *. * * I have always thought, from my earliest youth till now, that the greatest scourge an angry Heaven ever inflicted upon an ungrateful and a sinning people, was an ignorant, a corrupt, or a dependent judiciary."

As almost a controlling influence on the conclusions reached herein, we quote the all-important language of the Declaration of Independence of the United States, wherein great citizens of South Carolina joined in declaring "he, (the King) has made judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries. * * *"

Great and good men, judges, statesmen, lawyers, and laymen have met together at times in the past, notably in the Constitutional Conventions of 1868 and 1895, and have deliberately sought to secure the independence of the judiciary by following the language quoted from the Declaration of Independence.

In no uncertain words, and for the benefit of the people of our country, Section 9 of Article 5, Constitution of 1895, provides their compensation "shall not be increased or diminished during their continuance in office."

Bearing in mind the depression and the economic emergencies through which we are passing, clearly understanding the duties and responsibilities which rested upon the members of our General Assembly in trying to meet this emergency, we believe the language of the Oklahoma Court can well be adopted here as an expression of our opinion (*Riley v. Carter, supra*): "* * * It is asserted the exigencies of that emergency required temporary measures be taken, which although constitutionally questionable in normal times, should not be disturbed on account of overriding necessity. To that view we cannot subscribe. The Constitution guarantees to the petitioner the compensation fixed by law to his office at the time of his election, and by so doing guaranteed to, the people of this state a Judicial system that would be entirely independent of the other two branches of government, and, if this cardinal constitutional guaranty must yield to so-called economic necessity, is it less sacred than those provisions of our Constitution which guarantee to every accused the right of trial by jury; that justice shall be administered without denial, delay, or prejudice; that no person shall be deprived of life, liberty, or property without due process of law; that all persons shall have the inherent right to life, liberty, and the pursuit of happiness and the enjoyment of the gains of their own industry? We think not. Each makes certain the enjoyment of the rights therein guaranteed, and we are totally unable to distinguish between constitutional guaranties so as to give effect to some during emergencies and deny effect to others."

So, in giving consideration to the arguments presented by the respondents here, that this Court should take judicial notice of present economic conditions in determining what exercise we shall make of our discretion in this case, we must without hesitation say that the independence of the several branches of our government must at all times be sustained, and this especially applies to the limitations con-

cerning the compensation of the members of our judiciary. We will not, therefore, hesitate to declare the law as we find it, and to issue such writs or process as may be necessary to continue in this state the Constitution as the supreme and fundamental law.

For the foregoing reasons, it is our opinion that the petitioner is entitled to the relief prayed for, and it is so ordered. Let a peremptory writ of mandamus issue.

Let certified copies of this order be served upon the respondents, and, if to the petitioner it seems necessary, further orders may be taken to carry into effect the judgment herein announced.

MR. ACTING ASSOCIATE JUSTICE THOS. F. McDOW, presiding, and MESSRS. ACTING ASSOCIATE JUSTICES ALVA M. LUMPKIN, JOHN I. COSGROVE, WM. S. NELSON, and T. F. WATKINS, concur.