691 S.E.2d 453

Frances P. SEGARS–ANDREWS, Petitioner,

v.

JUDICIAL MERIT SELECTION COMMISSION, The State of South Carolina, Andre Bauer, in his official capacity as President of the South Carolina Senate, and Glenn F. McConnell, in his official capacity as President Pro Tempore of the South Carolina Senate, and Robert W. Harrell, Jr., in his official capacity as Speaker of the South Carolina House of Representatives, Respondents.

No. 26791.

Supreme Court of South Carolina.

Heard March 2, 2010.

Decided March 23, 2010.

110

112

Morris D. Rosen, of Rosen Rosen & Hagood, LLC; Alexander M. Sanders; Armand Derfner, D. Peters Wilborn, Jr., Jonathan S. Altman, and Samuel Altman, of Derfner, Altman & Wilborn, LLC, all of Charleston, for Petitioner.

Michael R. Hitchcock, John P. Hazzard, V, and Kenneth M. Moffitt, Legal Counsel for the South Carolina Senate, of Columbia, for Judicial Merit Selection Commission, the Honorable R. Andre Bauer, in his official capacity as President of the S.C. Senate, and the Honorable Glenn F. McConnell, in his official capacity as President Pro Tempore of the S.C. Senate.

Bradley S. Wright, Charles F. Reid, and Patrick D. Dennis, Legal Counsel for the South Carolina House of Representatives, of Columbia, for Judicial Merit Selection Commission and the Honorable Robert W. Harrell, in his official capacity as Speaker of the S.C. House of Representatives.

Attorney General Henry D. McMaster and Assistant Deputy Attorney General J. Emory Smith, Jr., of the Office of the Attorney General, of Columbia, for the State of South Carolina.

Ruth F. Buck, of Mt. Pleasant, pro se amicus curiae.

Pamela E. Deal, of Deal & Deal, P.A., of Clemson, for amicus curiae South Carolina Chapter of the American Academy of Matrimonial Lawyers.

Constance A. Anastopoulo, of Charleston, for amicus curiae South Carolina League of Women Voters.

PER CURIAM.

This is a matter in our original jurisdiction. For the reasons set forth below, we are constrained to dismiss the complaint.

## I.

### Factual/Procedural Background

Pursuant to the South Carolina Constitution, the election and reelection of justices and judges in South Carolina's unified judicial system is vested solely in the South Carolina General Assembly. These judgeships include supreme court justice, court of appeals judge, circuit court judge, and family court judge. The Judicial Merit Selection Commission (JMSC) is constitutionally and statutorily charged with evaluating the qualifications and fitness of all judicial candidates for election and re-election. Only those candidates found qualified by the JMSC may be submitted to and considered by the Legislature.

Judge Segars–Andrews (Petitioner) was elected by the General Assembly to the family court bench in 1993. Petitioner has served ably and with honor as a family court judge. The South Carolina House of Representatives honored Petitioner for her many years of volunteer service to the Charleston County Juvenile Drug Court. Since her election in 1994, Petitioner has been re-elected for successive six-year terms in 1998 and 2004.

Petitioner's current term expires on June 30, 2010. She applied for re-election with the JMSC in the normal course. No other individual filed for the judgeship. William R. Simpson, Jr., a disgruntled family court litigant, opposed Petitioner's re-election. After considering the litigant's complaint concerning Petitioner's failure to recuse in his divorce case, a majority of the JMSC found Petitioner unqualified, thereby foreclosing the Legislature's consideration of her re-election bid. The JMSC's finding was based solely on its determination, in the category of "ethical fitness," that Petitioner violated Canons 2 and 2A of the Code of Judicial Conduct, Rule 501, SCACR, when she refused to recuse in a divorce action.[1]

---

1. The court of appeals affirmed Petitioner's denial of the plaintiff's motion for recusal in the divorce action. *Simpson v. Simpson*, 377 S.C. 519, 660 S.E.2d 274 (Ct.App.2008). The plaintiff also filed a complaint against Petitioner with the Commission on Judicial Conduct, alleging Petitioner had acted unethically. The Commission on Judicial Conduct dismissed the complaint, finding there was no evidence Petitioner had violated any ethical rules. The same allegations that were before the Commission on Judicial Conduct formed the basis for the JMSC's finding that Petitioner was unqualified. The JMSC's finding with regard to Petitioner's ethical fitness states the following:

 The Commission's investigation revealed evidence that [Petitioner]'s conduct caused an appearance of impropriety that led a litigant not only to question [Petitioner]'s ability to render a fair and impartial decision, but also to lose faith in the integrity of this state's judicial system.
 . . .
 It is the Commission's finding that [Petitioner] demonstrated an understanding of how the Canons of Judicial Conduct have been interpreted; however, in abruptly reversing her decision about recusal, based upon a submission from opposing counsel who had a financial and continuing relationship with her husband's law firm, she raised suspicions about her impartiality that were compounded by connections between opposing counsel and her husband's law firm and by her service on the board of the Office of Judicial Conduct. At the Family Court hearing on April 14, 2006, where she revealed the six-figure financial connection between her husband's law firm and opposing counsel, [Petitioner] vehemently insisted that she could not set the situation right for [plaintiff] and that her only alternative was to let him have a new trial. When she failed to provide him with that alternative and gave only a perfunctory explanation that she was relying on opposing counsel's submission, she created an atmosphere of distrust that made [plaintiff] construe both her ruling and the system that authorized and sanctioned it as corruptible and capable

116

Petitioner filed an action challenging the decision of the JMSC on multiple grounds, an action we accepted in our original jurisdiction. Petitioner raises several constitutional challenges, including separation of powers and a claim that legislative membership on the JMSC violates the constitutional prohibition against "dual office" holding. Respondents assert Petitioner's action should be summarily dismissed as a nonjusticiable political question. We disagree. The Complaint raises **legal** issues, which satisfy threshold justiciability requirements. Those legal challenges must be addressed and resolved. It is the duty of this Court to do so, and we have carefully considered Petitioner's legal challenges. While the complaint of Petitioner raises substantial and concerning judicial independence issues, it is our firm judgment that the law provides her no relief.

## II.

## LAW/ANALYSIS

### A. The Constitutionality of the JMSC and Separation of Powers

Article I, § 8 of the South Carolina Constitution provides:

In the government of this State, the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other.

The constitution vests in the Legislature the sole authority for the election and re-election of judges, specifically supreme court justices, court of appeals judges and circuit court judges. S.C. Const. Art. V, §§ 3, 8 and 13. By statute, the Legislature is similarly charged with the election and reelection of family court judges. S.C.Code Ann. § 63–3–30(B) (2008).[2]

---

of manipulation by persons with connections to a judge or a judge's spouse.

For this reason, the Commission must find [Petitioner] unqualified.

**2.** The Legislature is also charged statutorily with the election and reelection of administrative law judges.

The constitution was amended by the people of South Carolina in 1997 to establish the JMSC. The JMSC was constitutionally established to mandate that all judgeships "which are filled by election of the General Assembly" be considered by the JMSC. Article V, § 27 provides in part:

In addition to the qualifications for circuit court and court of appeals judges and Supreme Court justices contained in this article, the General Assembly by law shall establish a Judicial Merit Selection Commission to consider the qualifications and fitness of candidates for all judicial positions on these courts and on other courts of this State which are filled by election of the General Assembly. The General Assembly must elect the judges and justices from among the nominees of the commission to fill a vacancy on these courts. No person may be elected to these judicial positions unless he or she has been found qualified by the commission.

The Legislature established the JMSC, providing for its membership, powers, duties, functions and procedures. S.C.Code Ann. § 2–19–10 (2008). The provision regarding membership provides:

(B) Notwithstanding any other provision of law, the Judicial Merit Selection Commission shall consist of the following individuals:

(1) five members appointed by the Speaker of the House of Representatives and of these appointments:

(a) three members must be serving members of the General Assembly; and

(b) two members must be selected from the general public;

(2) three members appointed by the Chairman of the Senate Judiciary Committee and two members appointed by the President Pro Tempore of the Senate and of these appointments:

(a) three members must be serving members of the General Assembly; and

(b) two members must be selected from the general public.

Petitioner states "[c]oncern has long been expressed that having the entire power and process of selecting judges vested in the legislature may tend to make the process too political." Accordingly, Petitioner asserts the "evident purpose of the people in adopting S.C. Const. Art. V, § 27 was to create a requirement beyond the power of the General Assembly, in the form of an independent body whose concurrence was a condition precedent to the General Assembly's selection of a judge." She argues the composition of the JMSC, established by the Legislature in Section 2–19–10(B), frustrates the very reason for its creation.

More specifically, Petitioner contends that the constitutional amendment precludes the presence of legislators on the JMSC. The use of the term "establish" in the constitutional amendment, she asserts, means the JMSC "was to be something new, not simply a remade version of the [earlier] Joint Legislative Committee for Judicial Screening." Citing opinions of this Court defining the term "establish," Petitioner maintains the intent of the amendment was to bring into being something that did not previously exist.

■■■■ The structure of the South Carolina Constitution provides the analytical framework for resolving Petitioner's challenge. The provisions of the state constitution are not a grant but a limitation of legislative power, so that the Legislature may enact any law not expressly, or by clear implication, prohibited by the state or federal constitution. *Moseley v. Welch*, 209 S.C. 19, 39 S.E.2d 133 (1946). State constitutional provisions will not be construed to impose limitations beyond their clear meaning. *State v. Broad River Power Co.*, 177 S.C. 240, 181 S.E. 41 (1935). Moreover, when the constitutionality of a statute is challenged, every presumption will be made in favor of its validity. A statute will not be declared unconstitutional unless its invalidity appears so clearly as to leave no doubt that it violates some provision of the constitution. *Gold v. S.C. Bd. of Chiropractic Exam'rs*, 271 S.C. 74, 245 S.E.2d 117 (1978). A "legislative act will not be declared unconstitutional unless its repugnance to the constitution is clear and beyond a reasonable doubt." *Joytime Distribs. and Amusement Co. v. State*, 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999).

■ The question, then, is whether the language in article V, § 27 expressly or by clear implication precludes (as violative of separation of powers) legislative membership on the JMSC. Because the constitutional amendment contains no express reference to legislative service on the JMSC, we are left with only the "clear implication" criteria. Here, Petitioner seeks to bolster her argument by blending judicial independence concerns with the constitutional prohibition against dual-office holding. As Petitioner's excellent counsel urged at oral argument, we should broadly construe our constitution because it does not expressly provide for the laudable goal of judicial independence. This argument is not without appeal, but it is irreconcilably at odds with the settled principle that the provisions of the state constitution are not a grant but a limitation of legislative power. Article V, § 27 simply contains no prohibition against legislative membership on the JMSC.

In making this determination, we are not persuaded by Respondents' argument that Act No. 391, 1996 S.C. Acts 2393, which added Chapter 19 to Title 2, including Section 2–19–10(B), was ratified on the same date as the joint resolution proposing the article V, § 27 amendment to the constitution. Respondents invite us to glean the meaning of the constitutional amendment from enabling legislation prepared prior to the vote on the constitutional amendment. We decline the invitation. While Respondents' argument may be technically correct, it is simply not realistic to give legal weight to the fiction that the electorate is sufficiently aware of enabling legislation at the time it votes on a constitutional amendment. The Constitution belongs to the people of South Carolina, not the Legislature. Our decision rests solely on the unambiguous language in article V, § 27, which contains no indication that the people intended to foreclose legislative membership on the JMSC.

■ The separation of powers argument that the Legislature is "both creating and executing" law must be rejected. In enacting Section 2–19–10 pursuant to the constitutional mandate of article V, § 27, the Legislature was acting within its constitutional role.

In exercising a political judgment in assessing the fitness of a judicial candidate, the JMSC is not constitutionally foreclos-

ed from addressing in a political context a matter concomitantly determined by the judicial branch. To be sure, judicial independence considerations are implicated. Yet this Court may not, under the allure of separation of powers, intervene in what is a political question. As the JMSC correctly observes in its brief, "the Court is being asked to delve into the subjective decision making process of the JMSC which is political in nature."

As noted, the complainant against Petitioner appealed the recusal issue to the court of appeals and filed a grievance with Commission on Judicial Conduct. The court of appeals affirmed Petitioner's decision not to recuse. The judicial grievance was dismissed.[3] Petitioner argues that in revisiting the recusal issue, the JMSC "usurped the power of the judicial branch by super-reviewing final legal determinations of the judicial branch." We find Petitioner's argument without merit. Simply stated, the Legislature has plenary authority over the political aspects of its constitutional authority in the election of judges. Beyond the legal/political distinction discussed above, we add the following observations.

Petitioner's notion of "super-reviewing" an action of the judicial branch would have merit but for the express constitutional delegation of authority to the legislative branch for the

---

3. Petitioner relies on Rule 20 of the Rules for Judicial Disciplinary Enforcement, Rule 502, SCACR, which states the following: "If a complaint has been dismissed, the allegations made in that complaint shall not be used for any purpose unless the complaint is re-opened by the Commission." Petitioner argues Rule 20 was promulgated by this Court pursuant to article V, § 4 of the South Carolina Constitution and is binding on all state officials, including judges, legislators and the JMSC. Petitioner contends the JMSC violated Rule 20 when it took up the identical complaint previously dismissed by the Commission on Judicial Conduct and decided for itself that Petitioner had violated the Code of Judicial Conduct. Petitioner is correct as to the preclusive effect of a dismissal by the Commission on Judicial Conduct in a subsequent judicial proceeding. The JMSC is a political proceeding. We further observe the Commission on Judicial Conduct did not "re-open" the complaint; Petitioner signed a waiver authorizing the JMSC to have access to Commission on Judicial Conduct records. And finally, the JMSC was not responding to a Commission on Judicial Conduct finding, but to a direct complaint filed by Simpson in the JMSC. The JMSC had the authority to consider Simpson's complaint, notwithstanding the Commission on Judicial Conduct's prior consideration of the same complaint.

election and re-election of judges. It seems to us that this point is most easily understood by applying the converse of Petitioner's argument. Assume the court of appeals reversed Petitioner's decision not to recuse or that the Commission on Judicial Conduct had made a finding adverse to Petitioner: would the JMSC be bound by that determination and be required to find Petitioner unqualified? Absolutely not.

What if Mr. Simpson had decided not to appeal Petitioner's recusal decision, due to lack of resources or otherwise? In that case, in the absence of an appellate court determination, would the JMSC be free to consider the matter? Or would Petitioner's "super-reviewing" position only apply in the presence of an appellate court determination? The implications are obvious, for we cannot place limitations on the ability of the JMSC to fully vet a judicial candidate based on the presence or absence of an appellate court determination. The same reasoning would apply with respect to a judicial grievance complaint. An individual wishing to file a complaint against a judge is not required to choose between the Commission on Judicial Conduct (a legal forum) and the JMSC (a political forum).

Consider also the case of *Sloan v. Hardee,* 371 S.C. 495, 640 S.E.2d 457 (2007). This Court was presented with a **legal** challenge to appointments approved by the Legislature. Because the case presented a justiciable controversy, we reached the merits and declared as unlawful legislative appointments beyond the term prescribed by law. *Hardee* illustrates the fundamental distinction between a legal question and a political question. In the separation of powers context, the JMSC has acted in its political capacity. As a result, there has been no showing of an article I, § 8 separation of powers violation concerning the JMSC.

 This returns us to Respondents' claim that Petitioner's complaint presents a nonjusticiable political question. "The nonjusticiability of a political question is primarily a function of the separation of powers." *S.C. Pub. Interest Found. v. Judicial Merit Selection Comm'n,* 369 S.C. 139, 142, 632 S.E.2d 277, 278 (2006) (*SCPIF*) (citing *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). "The fundamental characteristic of a nonjusticiable 'political question' is that

its adjudication would place a court in conflict with a coequal branch of government." *SCPIF*, 369 S.C. at 142–43, 632 S.E.2d at 278 (citing *U.S. v. Munoz–Flores*, 495 U.S. 385, 393–94, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990)). Therefore, the courts will not rule on questions that are exclusively or predominantly political in nature rather than judicial. *SCPIF*, 369 S.C. at 143, 632 S.E.2d at 278 (citing *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948)). This Court, specifically, has declined to opine on issues where the constitution delegates authority to the Legislature. *See SCPIF* (holding the question of whether the JMSC properly determined residence of judicial candidate or gave proper weight to concerns regarding residency presented a nonjusticiable political question the Court should decline to answer because the power to determine if a person is qualified to hold judicial office is vested with the Legislature by the state constitution); *cf. Stone v. Leatherman*, 343 S.C. 484, 541 S.E.2d 241 (2001) (holding state constitution provides Senate with authority to judge election returns and qualifications of its members).

■■ "In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker*, 369 U.S. at 198, 82 S.Ct. 691. In determining whether a question is political and nonjusticiable, "the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations." *Coleman v. Miller*, 307 U.S. 433, 454–55, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). "Much confusion results from the capacity of the 'political question' label to obscure the need for case-by-case inquiry. Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution. To demonstrate this requires no less than to

analyze representative cases and to infer from them the analytical threads that make up the political question doctrine." *Baker*, 369 U.S. at 210–11, 82 S.Ct. 691. The political question doctrine "is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Id.*

 Indeed, this Court is duty bound to review the actions of the Legislature when it is alleged in a properly filed suit that such actions are unconstitutional, as the above reference to *Sloan v. Hardee* illustrates. While "[a]ll considerations involving the wisdom, policy, or expediency of an act are addressed exclusively to the General Assembly[,] . . . when the unconstitutionality of an act is clear to this court, beyond a reasonable doubt, then it is its plain duty to say so." *Elliott v. Sligh*, 233 S.C. 161, 103 S.E.2d 923 (1958); *see Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (stating the political question doctrine, which derives from the separation of powers doctrine, excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of state legislatures or to the confines of the executive branch). It is the duty of this Court to interpret and declare the meaning of the constitution. *Abbeville County Sch. Dist. v. State*, 335 S.C. 58, 515 S.E.2d 535 (1999).

Accordingly, because of Petitioner's separation of powers argument, this Court must analyze the claim, which it has done. At the end of the day, Petitioner's separation of powers challenge presents not a legal question, but a nonjusticiable political question.

## B. JMSC and Dual–Office Holding

Petitioner's dual-office argument presents a bona fide legal challenge. Article III, § 24 of the South Carolina Constitution provides:

> No person is eligible to a seat in the General Assembly while he holds any office or position of profit or trust under this State, the United States of America, or any of them, or under any other power, except officers in the militia, mem-

bers of lawfully and regularly organized fire departments, constables, and notaries public. If any member accepts or exercises any of the disqualifying offices or positions he shall vacate his seat.

Article VI, § 3 of the South Carolina Constitution provides: No person may hold two offices of honor or profit at the same time. This limitation does not apply to officers in the militia, notaries public, members of lawfully and regularly organized fire departments, constables, or delegates to a constitutional convention.

 Petitioner asserts service on the JMSC is a constitutional office, a contention Respondents deny. A careful review of our jurisprudence compels a finding that the JMSC is an office in the constitutional sense.

 "One who is charged by law with duties involving an exercise of some part of the sovereign power, either small or great, in the performance of which the public is concerned, and which are continuing, and not occasional or intermittent, is a public officer." *Sanders v. Belue*, 78 S.C. 171, 174, 58 S.E. 762, 763 (1907). In considering whether a particular position is an office in the constitutional sense, it must be demonstrated that "[t]he power of appointment comes from the state, the authority is derived from the law, and the duties are exercised for the benefit of the public." *Willis v. Aiken County*, 203 S.C. 96, 103, 26 S.E.2d 313, 316 (1943). "The powers conferred and the duties to be discharged with regard to a public office must be defined, directly or impliedly, by the legislature or through legislative authority. The duties must be performed independently and without control of a superior officer, other than the law, unless they are those of an inferior or subordinate officer, created or authorized by the legislature and by it placed under the general control of a superior officer of body." 63C Am Jur.2d *Public Officers and Employees* § 5 (2009).

The JMSC asserts it exercises no part of the sovereign and merely serves in an advisory capacity because the Legislature may reject the candidates approved by the JMSC. The JMSC misapprehends its power. The exercise of power of the sovereign by the JMSC is seen not only in its ability to favorably submit judicial candidates to the Legislature for

consideration, but more importantly in its power to **exclude** candidates. The Legislature lacks any authority to consider a judicial candidate whose name is not favorably submitted by the JMSC. *See* S.C. Const. Art. V, § 27 ("No person may be elected to these judicial positions unless he or she has been found qualified by the commission."); S.C.Code Ann. § 2–19–80(B) and (C)(1) (2008) (providing that "the General Assembly ... shall not elect a person not nominated by the commission [and] [i]f the commission does not find the incumbent justice or judge qualified for the judicial office held and sought, his name shall not be submitted to the General Assembly for re-election and upon expiration of his then current term of office, he shall cease serving in that judicial position"). The JMSC exercises the power of the sovereign.

There can be no serious contention that the JMSC is not a constitutional office, for it exercises part of the sovereign and it possesses essentially all the additional characteristics, and more, commonly associated with an office in the constitutional sense. The features and powers of the JMSC include the authority to administer oaths; take depositions; issue subpoenas to compel the attendance of witnesses and the production of records; petition the circuit court in the case of "contumacy;" and most importantly, absolute control over which judicial candidates will, and will not, be submitted to the Legislature for a vote. *See* § 2–19–80(B).

A finding of an "office," for constitutional purposes does not end the inquiry. Our jurisprudence has a narrow, yet firmly established, exception which provides that "double or dual office holding in violation of the constitution is *not applicable to those officers upon whom other duties relating to their respective offices are placed by law.*" *Ashmore v. Greater Greenville Sewer District,* 211 S.C. 77, 92, 44 S.E.2d 88, 95 (1947) (emphasis added). This exception is commonly referred to as the "ex officio" or "incidental duties" exception.

As applied here, service on the JMSC by members of the General Assembly is properly characterized as incidental to their legislative duties. This is so because the Legislature is impressed by our constitution with sole responsibility for the election and re-election of judges. Conversely, service on the JMSC by one who holds an office in the executive or

judicial branch would violate the constitutional ban on dual-office holding. The "ex officio" or "incidental duties" exception may be properly invoked only where there is a constitutional nexus in terms of power and responsibilities between the first office and the "ex officio" office. This narrow construction of the "ex officio" or "incidental duties" exception preserves inviolate the central feature of separation of powers in our constitution. S.C. Const. Art. I, § 8.

The case of *Ashmore v. Greater Greenville Sewer District* is instructive. In *Ashmore,* the General Assembly passed legislation calling for the building of an "Auditorium." The legislation provided for a "Board of Trustees" to oversee the issuance of bonds to finance the project. By law, the Board included many persons, including "the Senator and a Representative of [Greenville] County." Membership on the Board by legislators was successfully challenged as a violation of separation of powers and dual-office holding.

The *Ashmore* Court analyzed the constitutional issues:

An enlightening discussion of the quoted provision is found in *Spartanburg County v. Miller,* 135 S.C. 348, 132 S.E. 673, 677 [ (1924) ], where it was said: 'As a general rule the Legislature of the state may not, consistently with the constitutional requirement here involved, undertake both to pass laws and to execute them by setting its own members to the task of discharging such functions by virtue of their offices as legislators, would seem to be self-evident. The principle, as we apprehend, upon the correct application of which depends the solution of any such problem as to the exercise by the Legislature of nonlegislative functions, is that the Legislature may properly engage in the discharge of such functions to the extent, and to the extent only, that their performance is reasonably incidental to the full and effective exercise of its legislative powers.' Paraphrasing the sentence which precedes [sic] this quotation from the opinion, it may be said that the members of the Legislature from Greenville County were elected for the purpose of making laws, not administering them.

The principle stated in *Spartanburg County v. Miller,* supra, was applied in *Bramlette v. Stringer,* 186 S.C. 134, 195 S.E. 257, and a county bond issue act was held invalid for

attempting to leave the execution of the law to the members of the legislature from the county. The authority of that decision cannot be consistently avoided in this. It requires similar holding of invalidity of the challenged provisions.

The qualifications of members of the General Assembly are carefully set out in Article III of the constitution. Section 24 thereof forbids the holding of other public office or position, and provides that upon the acceptance of any such by a member he shall vacate his seat. The proposition seems to us to prove itself, that a member cannot sit upon the board of auditorium trustees established in the act under review and at the same time retain his membership in the General Assembly. The language of the fundamental law is plain and unambiguous. It admits of no doubt of its meaning.

*Id.* at 89–90, 44 S.E.2d at 94.

Service by members of the legislative branch in an office charged with the execution of the law violates separation of powers and dual-office holding. That was the case in *Ashmore*. *Ashmore* referenced the "ex officio" or "incidental duties" exception: "A common example is ex officio membership upon a board or commission of the unit of government which the officer serves in his official capacity, *and the functions of the board or commission are related to the duties of the office.*" *Id.* at 92, 44 S.E.2d at 95 (emphasis added).

Paraphrasing from *Spartanburg County v. Miller,* as approvingly referenced in *Ashmore,* members of the General Assembly may properly serve on the JMSC as such service is reasonably incidental to the full and effective exercise of their legislative powers. Accordingly, we dismiss Petitioner's dual-office claim against the members of the General Assembly who serve on the JMSC.

## III.

### Judicial Independence

The elephant in the room is judicial independence. A central feature of Petitioner's case concerns judicial independence. Echoing those same concerns, amici curiae briefs in

support of Petitioner have been filed by the South Carolina Chapter of the American Academy of Matrimonial Lawyers and the League of Women Voters of South Carolina. It is argued that the actions of the JMSC in finding Petitioner not qualified undermine the independence of the judiciary. More to the point, we are reminded that it is a chilling threat to judicial independence for judges to approach decision making knowing that the difficult and sometimes unpopular decisions they must make will be resurrected in the re-election process through a political lens.

All but three states impose some sort of re-election process, from public elections, to retention elections, to reappointment by the executive or the legislature. "Thus, in 47 states, incumbent judges know that their ability to keep their jobs depends on gaining the approval of others. This is hardly a scheme calculated to ensure that judges will apply the law. Reappointments and reelections are instituted precisely so that the incumbent judges do not stray too far from the preferences of the reappointing authorities. From an independence perspective, it makes no difference whether the re-selection is done by popular election or reappointment; in both cases judges are made answerable—accountable—for their decisions to an institution that is concerned with political results far more than with legal principle." Michael R. Dimino, Sr., *Accountability Before the Fact*, 22 Notre Dame J.L. Ethics & Pub. Pol'y 451 (2008).

Judicial independence is not for the protection of judges, although it is often thought of in that context today. The principle of judicial independence is designed to protect our system of justice and the rule of law, and thus maintain public trust and confidence in the courts. With judicial independence, the winners are everyone.

We acknowledge the importance of judicial independence and our ethical mandate to uphold the integrity and independence of the judiciary. Indeed, this Court emphasized the cornerstone importance of judicial independence as support for its decision in *Grimball v. Beattie*, 174 S.C. 422, 177 S.E. 668 (1934). In the depression years of the 1930s, the Legisla-

ture sought to allocate scarce revenues by reducing judicial salaries. Because the constitution provided that a judge's "compensation ... shall not be diminished during the term [of office],"[4] Grimball, a circuit judge, filed an action to declare the offending legislation unconstitutional and to recover the unpaid balance of his compensation.

This Court declared unconstitutional the legislative effort to reduce judicial pay. After reviewing the applicable constitutional provisions, the Court acknowledged the judicial independence concerns and found "convincing" the following language from the Oklahoma Supreme Court:

If it be assumed that the only reason for the placing of this provision in our Constitution was to make secure to the public officials of this state the receipt of the salary fixed at the time of their election, then the suggestion of the withholding of the writ by this court would be entitled to the serious consideration of this court, but this assumption overlooks the history of the reasons for the insertion of this and similar provisions in the constitutions of practically all of the states and the Constitution of the United States. As applied to the judicial department, the history of such provisions shows clearly that they were inserted in the various constitutions for the purpose of making absolutely independent the judicial branch of the government, ... the evident purpose expressed in each is the continuation of separate and independent branches of government.

*Id.* at 438, 177 S.E. at 675 (citing *Riley v. Carter*, 165 Okla. 262, 25 P.2d 666 (1933))

*Grimball* further quoted approvingly from a letter by former United States Supreme Court Chief Justice Taney to the Secretary of the Treasury:

The Judiciary is one of the three great departments of the government, created and established by the Constitution. Its duties and powers are specifically set forth, and are of a character that requires it to be perfectly independent of the two other departments, and in order to place it beyond the

---

4. S.C. Const. Art. V, § 16 (formerly § 9).

reach and above even the suspicion of any such influence, the power to reduce their compensation is expressly withheld from Congress, and excepted from their powers of legislation.

*Id.* at 441, 177 S.E. at 676.

The Court concluded by "quot[ing] the all-important language of the Declaration of Independence of the United States, wherein great citizens of South Carolina joined in declaring 'he, (the King) has made judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries.'" *Id.*

Judicial independence served as an important adjunct to the *Grimball* decision. Yet the legal basis for the Court's ruling was the constitutional provision requiring that a judge's compensation not be diminished during his term of office. There is no such legal foundation to Petitioner's claim.

▇▇▇ We are left with Petitioner's stand-alone judicial independence claim. Notwithstanding the undeniable significance of judicial independence, a judge's ethical duty to uphold judicial independence is not a grant of judicial power. We may not under some thinly veiled guise of law assert judicial power to an action taken by another branch that lies within its exclusive constitutional authority. The South Carolina Constitution expressly vests in the JMSC the sole determination of a judicial candidate's qualifications, and the General Assembly is constitutionally charged with the election and reelection of judges found qualified by the JMSC. Absent an unconstitutional exercise of those powers, the Court may not intervene in these political determinations. To judicially intervene in the purely political determination of the JMSC would itself violate separation of powers.

**COMPLAINT DISMISSED.**

PLEICONES, J., concurring in result only.