### In re BARNWELL COUNTY HOSPITAL, Debtor.

#### No. 11–06207–dd.

United States Bankruptcy Court, D. South Carolina.

May 23, 2012.

---

Barbara George Barton, Columbia, SC, Lindsey Carlbert Livingston, Columbia, SC, Stanley H. McGuffin, Columbia, SC, for Debtor.

**ORDER CONFIRMING DEBTOR'S FIRST AMENDED PLAN FOR ADJUSTMENT OF DEBTS PURSUANT TO CHAPTER 9 OF THE BANKRUPTCY CODE**

DAVID R. DUNCAN, Bankruptcy Judge.

This matter is before the Court for confirmation of the First Amended Plan for Adjustment of Debts [Doc. 126] as modified by the Debtor's Modification to the First Amended Plan for Adjustment of Debts ("Modification") [Doc. 205] (collectively the "Plan") filed by Barnwell County Hospital (the "Debtor"). Objections to Debtor's Plan were filed by Creekridge Capital, LLC, ("Creekridge"), Nexsen Pruet, The United States of America on behalf of the United States Department of Health and Human Services ("HHS"), Palmetto Emergency Care, P.A. and Palmetto Hospitalist Associates (collectively, "Palmetto"), General Electric Company d/b/a GE Healthcare Diagnostic Imaging ("GE"), Robert M. Peeples and certain participants of the Barnwell County Hospital Pension Plan (collectively, "Peeples"), and Intervener Don Alexander ("Alexander").[1] A hearing was held on Debtor's Plan on April 30, 2012 and May 3, 2012.

---

1. While styled as an Objection to Debtor's Plan, Alexander challenges only whether

Prior to or at the conclusion of the hearing, all objections to the Plan were consensually resolved except for the objections of Peeples, Alexander and GE. Based on the findings of fact and conclusions of law stated on the record at the hearing and set forth in detail below, Debtor's chapter 9 Plan is confirmed.

### HISTORY AND BACKGROUND OF DEBTOR

The Debtor was created in 1953 by act of the South Carolina Legislature to provide hospital facilities to the residents of Barnwell County (the "County"). The legislature created the Barnwell County Hospital Board (the "Board") and charged it with the responsibility of constructing a hospital and making all rules and regulations for the operations and management of the Debtor. Debtor operates as a hospital at 811 Reynolds Road, Barnwell, South Carolina. The Debtor also owns and operates two provider-based rural health clinics in the southwestern rural area of South Carolina serving the communities of Blackville and Williston.

The Debtor is and has been unable to pay its debts as they become due. For years, Barnwell County provided funding to keep the Debtor operating, however the Debtor was informed that the County would no longer provide funding. Furthermore, as a rural hospital, Debtor faces numerous business challenges, including a low customer volume and a high number of indigent patients. Consequently, the Debtor has a limited ability to pay for new technology and facilities that larger hospitals in neighboring areas can provide. Such technology and facilities are neces-

sary to attract specialty physicians to work at the hospital in order that, in turn, increase revenue and profit opportunities.

Based upon those factors and others, the Debtor, along with Bamberg County Memorial Hospital (together with the Debtor, being hereafter referred to as the "Hospitals"), sought a third party purchaser to combine the existing primary service areas and healthcare facilities and businesses located in and owned by Bamberg and Barnwell Counties, South Carolina (collectively, the "Counties"), into one regional hospital or health system in order to provide their residents access to efficient and effective healthcare, and to have that care delivered through well-equipped, contemporary facilities designed to meet the specific needs of each community. In order to provide such access, it was decided that a collaborative regional system for healthcare for the residents of the Counties would attract the financial support needed to provide healthcare services that can sustain themselves through changes in medical technology, regulations, and reimbursement, and can support continued upgrades in facilities and services.

To help the Counties find a third party to achieve the Counties' goals, the Counties engaged Stroudwater Capital ("Stroudwater") to reach out to all interested people in the region in order to determine what was important to the Counties' residents and to find potential parties who were interested in developing the regional health system. After an extensive solicitation process, SC Regional Health System, LLC ("RHS") was identified and approved as the entity best suited to acquire substantially all of the assets of

Debtor is eligible to be a chapter 9 Debtor. On May 3, 2012, a separate hearing was held on the issues raised in Alexander's objection related to Debtor's eligibility as a chapter 9 debtor.

the hospitals and to create a regional health system in accordance with the identified goals of the Counties.

On September 29, 2011, the Debtor, along with Bamberg County Memorial Hospital[2] and the Counties, executed an Asset Purchase Agreement ("APA") with RHS for the acquisition of substantially all of the assets of the Hospitals. The parties also executed a Development Agreement. The APA and Development Agreement provide that RHS will develop and operate an integrated healthcare delivery system to be known as the Regional Health System ("Regional Health System") to serve both Counties. The APA and Development Agreement provide for the construction of a new hospital with at least 23 inpatient beds.

The Plan is based on the APA and contemplates that both the Debtor and Bamberg County Memorial Hospital will have filed bankruptcy. Both the Debtor and Bamberg County Memorial Hospital must be successful in having their respective plans confirmed, or the APA will not be consummated.

### CONFIRMATION OF DEBTOR'S PLAN

The Debtor having:

a. on October 5, 2011 (the "Petition Date"), filed its voluntary petition for relief under chapter 9 of the United States Bankruptcy Code (the "Bankruptcy Code"),[3] in the United States Bankruptcy Court for the District of South Carolina (the "Bankruptcy Court");

b. published notice of the filing of its chapter 9 petition and request for the entry of an order for relief thereunder in *The State* and *People–Sentinel* newspapers, and in addition, mailed notice to all known creditors and parties in interest;

c. filed, on February 10, 2012, a disclosure statement and plan for adjustment of debts;

d. filed, on March 23, 2012, a First Amended Disclosure Statement and First Amended Plan for Adjustment of Debts, which was thereafter supplemented, modified and amended on May 9, 2012, (as such, the "Disclosure Statement" and "Plan", respectively);

e. distributed solicitation materials consistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the District of South Carolina Local Bankruptcy Rules (the "Local Bankruptcy Rules"), and the Order (I) Scheduling Hearing on Confirmation of the First Amended Plan for Adjustment of Debts; (II) Approving Solicitation Procedures; (III) Establishing Deadlines; and (IV) Approving Form and Manner of Notice of the Confirmation Hearing [Docket No. 130] (the "Solicitation Procedures Order");

f. filed, on April 27, 2012, Debtor's Ballot Tabulation ("Ballot Tally"), detailing the results of the Plan voting process; and

g. filed, on May 4, 2012, the Debtor's Memorandum in Support of Confirmation of the Plan ("Plan Confirmation Brief").

The Bankruptcy Court having:

---

**2.** Bamberg County Memorial Hospital also filed a chapter 9 bankruptcy petition. See Case No. 11–03877–dd, filed June 20, 2011.

**3.** Further references to the Bankruptcy Code (11 U.S.C. §§ 101 *et seq.*) may be by section number only.

a. conducted a hearing on the Disclosure Statement on March 19, 2012 and approved the Disclosure Statement by Order dated March 23, 2012;

b. entered the Solicitation Procedures Order on March 23, 2012;

c. set April 30, 2012 at 10:00 a.m., prevailing Eastern Time, as the date and time for the commencement of the hearing to consider confirmation of the Plan (the "Confirmation Hearing");

d. reviewed the Plan, the Disclosure Statement, the Ballot Tally, the Plan Confirmation Brief and all filed pleadings, exhibits, statements and comments regarding confirmation of the Plan under the Bankruptcy Code ("Confirmation"), including all objections, statements and reservations of rights;

e. heard the statements, arguments and objections made by counsel in respect of Confirmation;

f. considered all oral representations, testimony, documents, filings and other evidence regarding Confirmation;

g. overruled any and all objections to the Plan and confirmation thereof; and

h. taken judicial notice of the papers and pleadings filed in this chapter 9 Case.

NOW, THEREFORE, it appearing to the Bankruptcy Court that notice of the Confirmation Hearing and the opportunity for any party-in-interest to object to Confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefore, the Bankruptcy Court makes and issues the following Findings of Fact, Conclusions of Law and Orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### JURISDICTION AND VENUE.

The Bankruptcy Court has jurisdiction over this chapter 9 case pursuant to 28 U.S.C. § 1334. Venue in the Bankruptcy Court was and is proper under 28 U.S.C. §§ 1408 and 1409. The Debtor is an entity eligible for relief under Bankruptcy Code § 109(c). Confirmation of the Plan constitutes a core proceeding under 28 U.S.C. § 157(b)(2), and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

### JUDICIAL NOTICE.

The Bankruptcy Court takes judicial notice of (and deems admitted into evidence for Confirmation) the docket of this chapter 9 case, including all pleadings and other documents on file, all orders entered, all hearing transcripts and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during the pendency of this case. Any resolutions of objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference. All unresolved objections, statements and reservations of rights are hereby overruled on the merits.

### BURDEN OF PROOF.

■ Debtor has met its burden of satisfying the confirmation requirements of

§ 943(b) by a preponderance of the evidence, which is the applicable evidentiary standard. *See In re Pierce County Hous. Auth.*, 414 B.R. 702, 715 (Bankr. W.D.Wash.2009); *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 31 (Bankr. D.Colo.1999).

ELIGIBILITY.

The Court turns to the issue of the eligibility of Debtor for relief under chapter 9 of the Bankruptcy Code. By prior order and after notice and hearing, the Court granted the Motion to Intervene filed by Don A. Alexander, and ordered that the parties submit briefs in support of their arguments. [Doc. No. 131]. Thereafter, Alexander filed a Brief in Objection to Debtor's Plan for Adjustment of Debts and Objection to Eligibility of Debtor ("Objection") [ (Doc. No. 145) ] and the Debtor filed a brief in response [Doc. No. 158] to which Alexander then filed a reply [Doc. No. 169]. A hearing on this matter was held on May 3, 2012.

Alexander, a former member of the Board, contends that the Debtor wrongfully filed for chapter 9 relief because members of the Board who instituted this action were holding such positions in violation of the South Carolina Constitution. Alexander claims that the Board members were also members of the Barnwell County Council ("County Council"). Therefore, they were holding dual offices, which is contrary to S.C. Const. Art. VI, § 3 and Art. XVII, § 1A. Debtor argues that it legally filed for chapter 9 relief because the dual offices held by these board members are not the type contemplated by the Constitution. The shared relationship between positions on the County Council and the Board is a vertical duality—the members' powers were not expanded by becoming Board members and holding the coinciding positions.

In addition, Alexander argues that Debtor is not eligible for chapter 9 relief because it does not meet the requirements to be a debtor under 11 U.S.C. § 109(c). Specifically, Alexander contends that Debtor was not "specifically authorized ... by State law" to file for bankruptcy relief because Debtor does not constitute one of the entities enumerated in S.C.Code Ann. § 6–1–10, which provides what entities may avail themselves to bankruptcy protection under Title 11. In response, Debtor asserts that because it constitutes a "governmental unit" and "municipality," as defined by the Code, it falls within the purview of S.C.Code Ann. § 6–1–10, which specifically grants it the authority to file bankruptcy.

FINDINGS OF FACT ON ELIGIBILITY ISSUES

Debtor was created in 1953 by act of the South Carolina Legislature to provide hospital facilities for Barnwell County. 1953 S.C. Acts 298. The Legislature created the Barnwell County Hospital and Nursing Home Board ("Original Board") and charged it with the responsibility to construct a hospital and establish all rules and regulations for its operations and management. *Id.*

Thereafter, the legislature enacted the Home Rule Act of 1975, S.C.Code Ann. § 4–9–10, *et seq.* (1986 & Supp. 1998). Pursuant to the Act, Barnwell County adopted the pure Council form of government. Under this form of government, both legislative and executive functions are under the purview of the County Council. The citizens of the County select and vote for those who will serve on the County Council, and whose powers and duties are outlined in part in S.C.Code Ann. § 4–9–

30(5) and (6). Section 4–9–30(6) specifically enumerates the powers of the County Council, which include those necessary and proper to provide and manage services for local public purposes. Section 4–9–30(14) also gives the Council the power to enact ordinances for the implementation and enforcement of the powers so conferred.

The County Council abolished the Original Board, took title to all assets of the Barnwell County Hospital and Nursing Home, and entered a contract with an outside group to manage the hospital. See Ordinance No. 1986–26. ("The Barnwell County Council shall assume responsibility for the operation, management and control of the Barnwell County Hospital and Nursing Home as of the effective date of this ordinance.") By Ordinance No. 1988–35, as amended by Ordinance Nos. 1993–62, 1999–139, 2003–176, and 2003–178, the County created the Board of Trustees of Barnwell County Hospital. The ordinances provided the Board with the authority and responsibility to make all rules and regulations for the operation and management of the Debtor. The ordinances also require regular reports to the County Council and authorize the Board to adopt budgets subject to the approval of the Council.

Appointments on the Board are made by the County Council. Seven of those representatives are recommended by the County Council members and two representatives are from the Barnwell County Hospital Medical Staff, with one of those two members being appointed by direct election of the medical staff.

Ordinance No. 2003–176 provides that the County Council may remove a board member by majority vote "for any reason or no reason at all." Any removed board member may be replaced by the nominating procedure set forth in the ordinances.

Rule 6.01 of the Barnwell County Council Rules of Procedure provides the following:

Members of Council have the authority pursuant to various ordinances of the County Council to appoint members from their District to various committees, boards and agencies established by County Council. To the extent that any ordinance of County Council requires that committee appointments of each member to be approved by the remainder of Council, that portion of those ordinances are hereby repealed. Each member of County Council is hereby entitled to appoint qualified electors of their District to committees, boards and agencies of the County, without the advice and consent of the remaining members of Council. If a councilperson seeks to appoint a qualified elector to a committee, board or agency from outside of their District, that appointment is subject to the advice and consent of County Council.

On April 26, 2011, the County Council met in a Special Meeting. Pursuant to Rule 6.01 and Ordinance No. 1988–35, as amended by Ordinance Nos. 1993–62, 1999–139, 2003–176, and 2003–178, by unanimous vote, seven members of the Board were replaced with the County Council members, who appointed themselves to the Board for their respective districts.

On September 27, 2011, the Board adopted a resolution to authorize the commencement and prosecution of this bankruptcy case. [Doc. No. 5].

On October 5, 2011, Debtor filed a voluntary petition seeking relief under chapter 9 of the Bankruptcy Code.

A group of citizens, including Alexander, filed a state court action in the Barnwell

County Court of Common Pleas against members of the County Council ("State Court Action"). *Alexander et al. v. Houston et al.*, C/A No. 2011–CP–06–476. The State Court Action involved arguments similar to those in the instant case, including challenges to the ability of the County Council members to also serve on the Board of the Debtor.

Thereafter, on March 7, 2012, Alexander filed a Motion to Intervene in the instant case, requesting that the Court stay this case until the State Court Action is ruled on "with finality." [Doc. No. 111]. On March 19, 2012, the Court granted the Motion to allow Alexander to challenge the Debtor's eligibility to be a chapter 9 debtor.

Thereafter, on May 2, 2012, on the motion of the County Council members, the state court dismissed the State Court Action. Relevant to this matter, the state court found that the County Council members did not violate the South Carolina Constitution, which provides, "[n]o person may hold two offices of honor or profit at the same time." S.C. Const. Art. VI, § 3. The state court reasoned that there is a vertical relationship between the County Council and the Board. While both positions may be considered offices as contemplated by the dual office holding prohibition, "because the Council has the power to perform the duties that they delegated to the Hospital Board without its existence, by removing the members of the Board and installing themselves in their stead the Council members gain no new or additional powers beyond those which they previously possessed." *Alexander*, C/A No. 2011–CP–06–476, slip op. at 8 (May 2, 2012). The court further reasoned that because the Board is a "sub-entity" of the County Council, "the County Council could have simply eliminated the Hospital Board and run the hospital based on the aforementioned authority, but instead chose to remove the members of the Board and place themselves in the positions." *Id.* at 9. Therefore,

> Since the Councilpersons have gained no new power and the Hospital Board is a sub-entity of the County Council, created and disbanded by the Council, the position are [sic] purely symbolic. Thus, the evil sought to be avoided by the constitutional prohibition against dual office holding does not exist in this case.

*Id.* (footnote omitted).

On May 3, 2012, this Court heard arguments from Alexander and Debtor on both the dual office holding issue and the issue of Debtor's eligibility under § 109(c).

### *Discussion and Conclusions of Law on Eligibility Issues*

#### ELIGIBILITY UNDER 11 U.S.C. § 109(C)

■ Section 109(c) sets forth certain requirements with respect to who may be a debtor under chapter 9. Among those requirements, the debtor must be: (1) a municipality; and (2) "specifically authorized in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." 11 U.S.C. § 109(c)(1), (2). There are three other requirements that an entity must satisfy before it is considered eligible for chapter 9 relief. *See* 11 U.S.C. § 109(c)(3)-(5). "The burden of establishing eligibility under § 109(c) is on the debtor." *In re City of Vallejo*, 408 B.R. 280, 289 (9th Cir. BAP 2009) (quoting *In re Valley Health Sys.*, 383 B.R. 156, 161 (Bankr.C.D.Cal.2008)). However, the

Court "construe[s] broadly § 109(c)'s eligibility requirements 'to provide access to relief in furtherance of the Code's underlying policies.'" *Id.* (quoting *In re Valley Health Sys.*, 383 B.R. at 163).

A municipality is defined by the Bankruptcy Code as a "political subdivision or public agency or instrumentality of a State." 11 U.S.C. § 101(40). This is the linchpin of the first requirement. The second requirement, authorization of the filing at the state level, results from the very nature of our federal system and recognizes the balance that must be struck when a political subdivision of a state avails itself of restructuring available only under federal law. In order to satisfy § 109(c)(2), "that explicit authorization must be written, 'exact, plain, and direct with well-defined limits so that nothing is left to inference or implication.'" *In re N.Y. City Off–Track Betting Corp.*, 427 B.R. 256, 267 (Bankr.S.D.N.Y.2010) (quoting *In re Timberon Water and Sanitation Dist.*, No. 9–07–12142 ML, 2008 WL 5170581, at *2 (Bankr.D.N.M. June 18, 2008) (concluding that the Code requires that the municipality be "specifically authorized" to file for bankruptcy)).

In *In re Connector 2000 Assoc., Inc.*, 447 B.R. 752 (Bankr.D.S.C.2011), this Court both applied the § 109 test and the test under the prior Bankruptcy Act to a chapter 9 debtor for determining whether an entity constitutes a municipality under the Code, and is therefore eligible for chapter 9 relief. *Id.* at 758. The test utilized by the Court was "whether the authority or agency is subject to control by public authority, state or municipal." *Id.* (quoting *Ex parte York Co. Natural Gas Auth.*, 238 F.Supp. 964, 976 (D.C.S.C.1965)). Upon a finding that the debtor constituted a "mu-

nicipality" under this test, the *Connector* Court then looked to whether the debtor was authorized under South Carolina state law to be a chapter 9 debtor. The Court found that "[b]ecause the Court has determined Debtor is a municipality, S.C.Code § 6–1–10 specifically authorizes it to file bankruptcy." *Id.* S.C.Code Ann. § 6–1–10 provides:

> The consent of the State is hereby granted to, and all appropriate powers are hereby conferred upon, any county, municipal corporation ... or other taxing or governmental unit organized under the laws of the State to institute any appropriate action and in any other respect to proceed under and take advantage of and avail itself of the benefits and privileges conferred, and to accept the burdens and obligations created, by any existing act of the Congress of the United States and any future enactment of the Congress of the United States relating to bankruptcy or the composition of indebtedness on the part of the counties, municipal corporations ... and other taxing or governmental units or any of them.

S.C.Code Ann. § 6–1–10.

Therefore, in following the approach of the *Connector* Court, this Court must first determine whether the Debtor is a municipality as defined by the Bankruptcy Code. If so, then the Debtor is authorized to file for chapter 9 relief, pursuant to S.C.Code Ann. § 6–1–10.

■ The Court finds that Debtor falls squarely within the definition under § 101(4) because it is an instrumentality of the State.[4] Debtor also satisfies the municipality test applied in the *Connector*

---

4. Alexander conceded that Debtor constitutes a "municipality." [Docket. No. 145 at 4 n.

case because it is subject to control by public authority. Under the Home Rule Act, S.C.Code § 4–9–310, Barnwell County implemented the Council form of government, in which the County Council has the power to create and disband any county sub-entities or Board. The Debtor is operated by a Board of Directors, which is comprised of members who are appointed by the County Council or are employees of the Debtor. Additionally, the County Council created the Board and conveyed its powers and duties by ordinance. The Board reports to the County Council, and the Hospital's budget is subject to County Council approval. Therefore, the Debtor is ultimately controlled by the County Council, which is a public authority because its members are elected by the citizens of Barnwell County. Accordingly, Debtor constitutes a "municipality" as defined by the Code and was specifically authorized to file for bankruptcy under S.C.Code Ann. § 6–1–10.

■ The statutory authorization for seeking bankruptcy relief under S.C.Code Ann. § 6–1–10 is broad. It extends not only to counties and municipal corporations but also to "governmental unit[s] organized under the laws of the State. . . ." S.C.Code Ann. § 6–1–10. Alexander argues that this limits Debtor since it, while originally organized under state statute, is a creature of county ordinance. This ignores the source of authority for county action, the Home Rule Act which authorizes counties to create or organize boards and agencies. As a result the Debtor is a governmental unit organized under state law, is a municipality for bankruptcy purposes and was authorized by state law to file this bankruptcy case.

As to the remaining requirements of § 109(c), based upon testimony at the con-firmation hearing, the Declaration of Charles Lowell Jowers, Sr. [Docket # 4], and the Debtor's Statement of Qualifications [Docket # 2], the Court finds that Debtor is eligible for relief under chapter 9 of the Bankruptcy Code, subject only to the contention that the action of the Board authorizing the filing of the voluntary petition was in violation of the South Carolina Constitution. The Court now turns to that issue.

## DUAL OFFICE HOLDING

■■ Alexander and the County Council strongly disagree on the issue of whether the removal of members of the Hospital Board and the replacement of those members with the individual County Council members is a violation of the South Carolina Constitution. This issue spawned litigation in South Carolina's Court of Common Pleas, as mentioned above. There is sparse appellate authority in the state on the issue, but a multitude of published opinions of the South Carolina Attorney General. The question presented is not definitively answered by easy application of the state jurisprudence. The job of a federal court in answering questions of state law which have not been addressed by the highest court of the state is to anticipate what that state court would do. *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir.1994) (citing *Doe v. Doe*, 973 F.2d 237, 240 (4th Cir.1992); *Empire Distrib. of N.C. v. Schieffelin & Co.*, 859 F.2d 1200, 1203 (4th Cir.1988); *Wilson v. Ford Motor Co.*, 656 F.2d 960 (4th Cir.1981)).

The South Carolina Constitution generally prohibits an individual from holding two offices of honor or profit at the same time. S.C. Const. Art. VI, § 3 ("No person may hold two offices of honor or profit

3]. However, this concession was later withdrawn at the hearing on this matter.

at the same time. This limitation does not apply to officers in the militia, notaries public, members of lawfully and regularly organized fire departments, constables, or delegates to a constitutional convention."); S.C. Const. Art. XVII, § 1A ("No person may hold two offices of honor or profit at the same time, but any person holding another office may at the same time be an officer in the militia, member of a lawfully and regularly organized fire department, constable, or a notary public. . . ."). These provisions were derived from the common law, which prohibited a person from holding two offices if they were "incompatible." "Incompatibility meant either that the offices involved 'such a multiplicity of business' that one person could not adequately perform both, or that they were 'subordinate and interfering with each other, inducing a presumption that they cannot be executed with impartiality and honesty.'" *Richardson v. Town of Mount Pleasant,* 350 S.C. 291, 293, 566 S.E.2d 523, 525 (2002) (quoting *State v. Buttz,* 9 S.C. 156 (1877) (finding that two incompatible offices cannot be performed by the same individual)). However, the 1895 South Carolina Constitution "extended the dual office holding proscription to all persons holding positions of 'honor or profit' exempting from the prohibition only notaries public and militia officers." *Id.* (citing Art. II, § 2).

The Home Rule Act grants broad powers to the counties of South Carolina. Among these various powers, counties are explicitly authorized:

> to establish such agencies, departments, ***boards,*** commissions and positions in the county as may be necessary and proper to provide services of local concern for public purposes, to prescribe the functions thereof and to regulate, ***modify,*** merge ***or abolish*** any such agencies, departments, boards, commissions and positions, except as otherwise provided for in this title.

S.C.Code Ann. § 4–9–30(6) (emphasis added). In addition, counties are granted the specific authority "to enact ordinances for the implementation and enforcement of the powers granted in this section . . ." S.C.Code Ann. § 4–9–30(14).

Pursuant to the Home Rule Act, Barnwell County adopted the County Council form of government. Under this form of government, "the responsibility for policy making and administration of county government shall be vested in the county council . . . who are qualified electors of the county." S.C.Code Ann. § 4–9–310. Thereafter, County Council adopted Ordinance No. 1986–26, which created the Barnwell County Hospital Board, and Ordinance No. 1988–35, which sets forth the compensation and powers and duties of the Board members.

"When construing the constitution, the [South Carolina Supreme] Court applies rules similar to those relating to the construction of statutes." *Fraternal Order of Police v. S.C. Dept. of Rev.,* 352 S.C. 420, 427–28, 574 S.E.2d 717, 721 (2002) (citing *Davis v. County of Greenville,* 313 S.C. 459, 443 S.E.2d 383 (1994)). In statutory interpretation, the cardinal rule is to determine and effectuate the intent of the legislature. *Grimsley v. S.C. Law Enforcement Div.,* 396 S.C. 276, 281, 721 S.E.2d 423, 426 (2012) (citing *Sloan v. Hardee,* 371 S.C. 495, 498, 640 S.E.2d 457, 459 (2007)). The legislature's intent should be ascertained primarily from the plain language of the statute because "[w]hat a legislature says in the text of a statute is considered the best evidence of

the legislative intent or will." *Jones v. State Farm Mut. Auto. Ins. Co.*, 364 S.C. 222, 231, 612 S.E.2d 719, 724 (Ct.App.2005) (citing *Bayle v. S.C. Dept. of Transp.*, 344 S.C. 115, 542 S.E.2d 736 (Ct.App.2001)). "When interpreting the plain meaning of a statute, courts should not resort to subtle or forced construction to limit or expand the statute's operation." *State v. Jacobs*, 393 S.C. 584, 587, 713 S.E.2d 621, 622 (2011).

■ However, "[i]f the language of an act gives rise to doubt or uncertainty as to legislative intent, the construing court may search for that intent beyond the borders of the act itself." *Jones*, 364 S.C. at 231, 612 S.E.2d at 724. In addition:

> [h]owever plain the ordinary meaning of the words used in a statute may be, the courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not possibly have been intended by the Legislature or would defeat the plain legislative intention. If possible, the court will construe the statute so as to escape the absurdity and carry the intention into effect.

*Hodges v. Rainey*, 341 S.C. 79, 91, 533 S.E.2d 578, 584 (2000) (quoting *Ray Bell Constr. Co. v. School Dist. of Greenville Co.*, 331 S.C. 19, 501 S.E.2d 725 (1998)).

The State Constitution provides:

> [t]he provisions of this Constitution and all laws concerning local government shall be liberally construed in their favor. Powers, duties, and responsibilities granted local government subdivisions by this Constitution and by law shall include those fairly implied and not prohibited by this Constitution.

S.C. Const. Art. XVII, § 1A. Furthermore, when specifically interpreting the powers bestowed upon counties pursuant to the Home Rule Act, the Court must liberally construe the county's powers in favor of the county "and the specific mention of particular powers may not be construed as limiting in any manner the general powers of counties." S.C.Code Ann. § 4–9–25.

■ While the passage of the State Constitution in 1895 may have "extended the dual office holding proscription to all persons holding positions of 'honor or profit' ..." *Richardson*, 350 S.C. at 293, 566 S.E.2d at 525, rendering the "incompatible" factor irrelevant, a number of South Carolina Attorney General's opinions indicate that the prohibition may not be as all-encompassing as Alexander proposes and that there are certain nuances to the proscription. Opinions of the Attorney General are persuasive, if not binding, authority in South Carolina. Each opinion issued by the Attorney General involves a fact-intensive inquiry into the positions held by the inquiring individual.

From a review of the various opinions, it is evident that an individual may not hold a seat on the county council and a county commission when the commission was created directly by state statute. *See* S.C.A.G. Op. No. 85, 1985 WL 165972 (Jan. 4, 1985) (recommending that a person serving simultaneously on the county council and that county's Water Resources Commission, which was created by statute and amended by ordinance pursuant to S.C.Code Ann. § 4–9–80, constitutes a dual membership); S.C.A.G. Op. 77, 1977 WL 24441 (Apr. 7, 1977) (advising that a county councilman may not serve as a board member on the Planning Commission of the county where the commission was created by statute and the terms for its members are fixed). In addition, an individual may not be appointed to multi-

ple positions within the county. *See* S.C.A.G. Op. No. 77, 1977 WL 24709 (Nov. 18, 1977) (recommending that an individual who was appointed to the county recreation commission and then appointed as a deputy coroner by the county coroner would constitute dual office holdings). Finally, it is clear that it is unconstitutional for an individual to be a city councilmember while holding a seat on a county board. *See* S.C.A.G. Op. (Feb. 26, 2007) (advising that a Barnwell City Councilmember may not consider an appointment to the Barnwell County Hospital Board of Trustees).

■ From these opinions, it is indicative that an individual is considered to hold "dual offices"—and is prohibited from doing so—when there is an expansion of power by holding both offices or the offices cross a "border" (i.e., city and county, county and state-established body, etc.), constituting a "horizontal duality" among the offices. *See In re Advisory Opinion,* 226 N.C. 772, 778, 39 S.E.2d 217, 221 (1946) (interpreting similar North Carolina constitutional provision and finding that " '[t]he manifest intent is to prevent double office—holding—that offices and places of trust should not accumulate in a single person.' " (quoting Smith, C.J., *Doyle v. Aldermen of Raleigh,* 89 N.C. 133, 136 (1883))).[5]

A review of the Attorney General's opinions does not indicate whether a County Councilmember is prohibited from being appointed to a county board when that board is created solely by ordinance adopted by the County Council. However, the Attorney General does clarify that when the ordinance establishing the board grants the County Council the authority to appoint that board's members, incident to that authority to appoint is the power to remove those board members. S.C.A.G. Op., 2006 WL 1574914 (May 31, 2006) (applied to the Fairfield County Council and the Fairfield County Recreation Commission). Further, if the ordinance sets a fixed term for the board members and the County Council wishes to remove them before expiration of their terms, it must establish cause for doing so.

Alexander suggests that *Richardson* controls and that the decision of the trial court in his litigation with County Council ignores the clear proscription of all dual office holding, except in the specific instances mentioned in the South Carolina Constitution. *Richardson,* however, does not turn on the narrow question of proscribed dual office holding but rather turns on the issue of whether a police officer falls within the definition of constable. Nonetheless, the dicta in *Richardson* suggesting the abrogation of the common law exceptions to a strict application of the doctrine proscribing dual office holding is persuasive. Fortunately for the County

---

5. The relevant portion of the parallel North Carolina constitutional provision provides:

It is salutary that the responsibilities of self-government be widely shared among the citizens of the State and that the potential abuse of authority inherent in the holding of multiple offices by an individual be avoided. Therefore, no person who holds any office or place of trust or profit under the United States or any department thereof, or under any other state or government, shall be eligible to hold any office in this State that is filled by election by the people. No person shall hold concurrently any two offices in this State that are filled by election of the people. No person shall hold concurrently any two or more appointive offices or places of trust or profit, or any combination of elective and appointive offices or places of trust or profit, except as the General Assembly shall provide by general law.

N.C. Const. Art. VI, § 9(1).

Council, *Richardson* is not the last word of the South Carolina Supreme Court on the issue.

■ More recently, the South Carolina Supreme Court considered the dual office holding issue in a case involving the service of members of the state legislature, which appoints judges to the state bench, on a commission that screens and nominates candidates from which the legislature makes appointment. In *Segars–Andrews v. Judicial Merit Selection Comm'n.*, 387 S.C. 109, 691 S.E.2d 453 (2010) the court held, "Our jurisprudence has a narrow, yet firmly established, exception which provides that 'double or dual office holding in violation of the constitution is not applicable to those officers upon whom other duties relating to their respective offices are placed by law.'" *Id.* at 125, 691 S.E.2d at 462 quoting *Ashmore v. Greater Greenville Sewer Dist.*, 211 S.C. 77, 92, 44 S.E.2d 88, 95 (1947). This exception is commonly referred to as the "ex officio" or "incidental duties" exception. The *Segars–Andrews* court went on to hold that membership by a state legislator on the commission, while clearly an office for constitutional purposes, did not violate the proscription on dual office holding because the membership was incidental of the duty to appoint judges. *Id.* at 127, 691 S.E.2d at 463. That is, the legislature, with the duty to appoint judges, clearly had an interest in ensuring that the pool of nominees was sufficient to produce good judges.

Thus, the state's jurisprudence thus clearly provides an exception to the dual office holding proscription beyond that contained in Alexander's interpretation of *Richardson.* At issue here is not a mere *ex officio* membership on the Hospital Board. Indeed, the County Council had historically placed one of its own on the Hospital Board in an *ex officio* capacity. If this narrow exception to the constitutional proscription on dual office holding extends to the case *sub judice,* which the Court finds it does, it is based in the incidental duties exception. This is consistent with the horizontal and vertical duality approach to dual office holding found in the Attorney General Opinions and in the opinion of the trial court in ruling on the same issue in the State Court Action between these same parties.

County Council has, by ordinance adopted pursuant to the Home Rule Act, responsibility for and ownership of the assets of the Hospital. The testimony at the confirmation hearing clearly established that there was a difference of view between the Hospital Board and County Council over the propriety and need for a bankruptcy filing which would lead to a sale of the Hospital assets to a private company. When the Hospital Board declined to act consistent with the desire of the owner of the asset its members were removed and replaced by County Council members with the clear intent of County Council to move forward with the disposition of assets through a bankruptcy filing. Nothing could be more an incident of the responsibility for and the ownership of assets than the action of the County Council in the instant matter. Rightly or wrongly, this is a function appropriate to the County Council and is not a violation of the South Carolina Constitution.

NOTICE, SOLICITATION AND ACCEPTANCE.

On March 23, 2012, the Bankruptcy Court approved the Disclosure Statement as containing adequate information in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules. On March 23, 2012, the Bankrupt-

cy Court entered the Solicitations Procedures Order which: (a) set April 25, 2012, as the Voting Deadline for voting to accept or reject the Plan; (b) fixed April 25, 2012, as the deadline for objecting to the Plan; (c) fixed April 30, 2012 at 10:00 a.m. prevailing Eastern Time as the date and time for the commencement of the Confirmation Hearing; and (d) approved the form and method of notice of the Confirmation Hearing set forth therein.

As evidenced by the Certificates of Service filed by the Debtor, due, adequate and sufficient notice of the Disclosure Statement, Plan and exhibits thereto, together with all deadlines for voting on or objecting to the Plan and the transactions contemplated thereby, has been given to: (a) all classes of creditors entitled to vote on the Plan, (b) parties that requested notice, and (c) all other parties as provided in the Solicitation Procedures Order, in substantial and material compliance with the Solicitation Procedures Order and Bankruptcy Rules 2002(b), 3017 and 3020(b), and no other or further notice is necessary or shall be required.

Based on the record, the Debtor and its respective directors, officers, employees, managers, attorneys, affiliates, agents and professionals (including but not limited to their attorneys, financial advisors, investment bankers, accountants, and other professionals that have been retained by such parties) have acted in "good faith" within the meaning of Bankruptcy Code § 1125(e) and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Solicitation Procedures Order and applicable non-bankruptcy law in connection with all of their respective activities relating to the tabulations and solicitation of acceptances or rejections of the Plan and

their participation in the other activities described in Bankruptcy Code § 1125, and thus are entitled to the protections afforded by Bankruptcy Code § 1125(e) and the exculpation provisions set forth in Article X of the Plan. The Debtor and its respective present and former officers, directors, employees, advisors, attorneys, and agents did not solicit the acceptance or rejection of the Plan by any holders of claims prior to the approval and transmission of the Disclosure Statement. In addition, all procedures used to distribute solicitation packages to holders of claims were fair, and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and all other applicable rules, laws and regulations. Such transmittal and service were adequate and sufficient, and no further notice is or shall be required.

Prior to the Confirmation Hearing, the Debtor filed the Ballot Tally. All procedures used to tabulate the Ballots were fair and conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and all other applicable rules, laws and regulations.

### Fed. R. Bank. P. 3016.

The Plan is dated and identifies the parties submitting it, thereby satisfying Bankruptcy Rule 3016(a). The filing of the Disclosure Statement with the clerk of the Bankruptcy Court satisfied Bankruptcy Rule 3016(b). The Plan and Disclosure Statement describe in specific and conspicuous language all acts to be enjoined and identify the entities that would be subject to the injunction; therefore, Bankruptcy Rule 3016(c) is satisfied.

### Confirmation Requirements of Section 943(B) are Satisfied.

As set forth in further detail below, the Plan complies with all applicable provisions

of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, including Bankruptcy Code § 943(b).

**SECTION 943(b)(1) IS SATISFIED.**

Section 943(b)(1) requires that the plan comply with the provisions of the Bankruptcy Code made applicable by §§ 103(f) and 901. Section 901(a) incorporates, among other things, the plan confirmation requirements of §§ 1129(a)(2), (a)(3), (a)(6), (a)(8), (a)(10), (b)(1), (b)(2)(A), and (b)(2)(B). The Debtor's Plan complies with each of these confirmation requirements.

*Debtor Has Complied with § 1129(a)(2).*

Section 1129(a)(2) requires that the proponent of the plan comply with the applicable provisions of Title 11. In a chapter 9 case, the particular provisions that require compliance by the Debtor in connection with administration of the case and confirmation of the plan, in addition to those discussed elsewhere in this order, are the provisions of § 1125, which require that the court approve a disclosure statement containing adequate information before acceptances or rejections of a plan may be solicited. By Order dated March 23, 2012, the Bankruptcy Court approved Debtor's Disclosure Statement. Section 1129(a)(2) is satisfied here.

*Section 1129(a)(3) is Satisfied as Debtor's Plan is Proposed in Good Faith by Lawful Means.*

Section 1129(a)(3) requires that the plan be "proposed in good faith and not by any means forbidden by law." In this case, the Plan maximizes the economic return to the Debtor's creditors of available funds in the most practicable way given the unusual and complex nature of this Case. The Plan devotes all of the Debtor's cash, accounts receivables and other assets remaining after the closing of the sale to payment of the Debtor's creditors. Under the circumstances, the Debtor has obtained a fair price for its assets; the Plan will therefore result in satisfaction of certain of the Debtor's secured debts, the payment of Allowed Administrative Claims, and a distribution to unsecured claims, albeit over time. By implementing the APA, the Debtor will be able to convey its hospital assets as a going concern. As a going concern, the value of the Debtor's assets, although small, is enhanced by several factors, including the experience and talent of employees, the value of assembled contracts and equipment, and the connections of the business to the community and other providers. The Plan allows the Debtor to realize that value and to distribute it to its creditors. To the extent the Peeples' objections go to the issue of good faith in proposing the plan, they are addressed separately in this order. Section 1129(a)(3) is satisfied.

*Section 1129(a)(6) is Not Applicable.*

The only material regulatory pre-condition necessary for the implementation of the Plan is the issuance of a certificate of need ("CON") to RHS for the operation of the new hospital. However, RHS has agreed to waive this requirement. *See* Notice of Execution of Waiver of Closing Conditions Under Asset Purchase Agreement [Doc. No. 203]. There are no other regulatory pre-conditions to the implementation of the Plan. Therefore, § 1129(a)(6) is not applicable.

*The Plan Has Been Accepted by Each Class of Claims Impaired under Plan as Required under § 1129(a)(8).*

Section 1129(a)(8) of chapter 11 requires as a condition to confirmation that the plan has been accepted by each class of claims or interests that is impaired under the

plan. Acceptance of a plan by a class is determined by the standards set in § 1126(c) which require that, of the votes submitted, "at least two thirds in amount and more than one-half in number of the allowed claims" accept a proposed plan. In this case, impaired Classes 2, 4, 6 and 7 affirmatively accepted the Plan in accordance with the voting standards of § 1126(c). Class 1, comprised of the claim of the HHS for Medicare overpayments, did not submit a ballot. However, the Debtor and HHS have reached an agreement regarding its treatment under the Plan, which is set forth in the Modification. Class 3 is not impaired for bankruptcy purposes, as discussed below. Class 5, comprised of Creekridge's claims, initially voted to reject the Plan. However, Debtor and Creekridge subsequently reached an agreement related to its treatment, the terms of which are set forth in the Modification. Creekridge amended its ballot during the Confirmation Hearing to accept the Plan based upon the Modification.

Therefore, all impaired classes have accepted the Plan. Since section § 1129(a)(8) is satisfied here, the "cramdown" provisions of § 1129(b) do not need to be analyzed in this case.

*One Impaired Class Has Accepted the Plan as Required by § 1129(a)(10).*

Under § 1129(a)(10), the court may confirm the plan only if, should any class of claims be impaired under the plan, at least one impaired class has accepted the plan. In this case, all impaired classes affirmatively accepted the Plan. Accordingly, § 1129(a)(10) is satisfied.

Debtor Complies with all Chapter 9 Provisions as Required by § 943(B)(2).

Section 943(b)(2) requires as a condition to confirmation that the plan comply with the provisions of chapter 9. The major requirements that are directed toward the plan in a chapter 9 case are those provisions of chapter 11 that are made applicable in chapter 9 cases by § 901(a). These requirements are satisfied in this case, as described above.

Although § 363 is not incorporated into chapter 9 by § 901, chapter 9 does incorporate § 1123(b), which provides in subsection (4) that a plan may "provide for the sale of all or substantially all of the property of the estate,[6] and the distribution of the proceeds of such sale among holders of claims or interests." The Plan is dependent upon the sale of the assets of Debtor, free of all liens, claims and interests, as more fully set forth in the APA.

The Court has considered the reason that Debtor pursued a sale of its assets and the efforts it undertook to identify a purchaser that could help achieve the goal of providing quality medical care to the residents of the Counties. Based upon the testimony and evidence presented, the Court finds that:

a. RHS is a good faith purchaser;

b. The APA was entered into in good faith by the Debtor and RHS;

c. The APA is approved and the Debtor is authorized to transfer the assets as contemplated by the APA to RHS; and

d. The transfer of assets to RHS as contemplated by the APA and the Plan shall be free and clear of claims, liens and interests.

The only other provisions of chapter 9 which are directed toward the plan are

---

6. "Property of the estate" in chapter 9 proceedings means "property of the debtor." 11 U.S.C. § 902(i).

§ 941, requiring that the plan be proposed and filed by the debtor, and § 942, governing modifications of the plan. Debtor has proposed and filed the Plan, satisfying § 941. On May 9, 2012, Debtor filed the Modification to make certain changes to the Plan which set forth various terms to resolve objections from specific creditors and to modify some administrative provisions in the Plan. The Modification does not adversely impact any creditors. The Plan, as modified by the Modification, meets the requirements of chapter 9. Sections 942 and 943(b)(2) are satisfied.

### DEBTOR HAS DISCLOSED PAYMENTS FOR SERVICES AND EXPENSES TO BE PAID IN ACCORDANCE WITH § 943(b)(3).

Section 943(b)(3) requires that all amounts to be paid by the Debtor or other persons for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable. As set forth in the Disclosure Statement, the Debtor disclosed the amounts paid to professionals due and owing as of February 28, 2012. Thereafter, counsel submitted an update of the amounts paid and due through March 31, 2012. There have been no objections to the Plan based upon these disclosures. The foregoing amounts are reasonable and necessary to effectuate the Plan and reorganization in this complex case, and thus § 943(b)(3) is satisfied. Debtor anticipates filing a final report and application to close the case, at which time it will provide an accounting of all fees and expenses incurred by Debtor's professionals. This finding by the Court as to reasonableness of fees at this time is an interim finding subject to review and modification upon the filing of the final report. Further, to the extent funds are not available to pay fees as of the Effective Date, counsel for Debtor has agreed to defer payment until such time as adequate funds are available.

### DEBTOR IS AUTHORIZED TO TAKE ACTIONS PROPOSED IN THE PLAN AS REQUIRED BY § 943(b)(4).

Section 943(b)(4) prevents the court from confirming any plan that requires the debtor to take any action prohibited by law. On September 27, 2011, the Board of Directors of Debtor adopted a resolution authorizing Debtor to do the acts authorized and directed to effect the consummation of the adjustment of Debtor's debts as provided in the Plan. Debtor is not otherwise prohibited by law from taking any action necessary to carry out the Plan, and § 943(b)(4) is satisfied.

### ALL ADMINISTRATIVE CLAIMS HAVE BEEN OR WILL BE PAID AS REQUIRED BY § 943(b)(5).

Section 943(b)(5) provides that the court must determine that the plan provides for the payment in full of all claims entitled to administrative expense priority. Throughout the course of the chapter 9 Case, Debtor has endeavored to satisfy administrative expenses as they became due. Accordingly, Debtor believes that all Claims that otherwise would constitute Allowed Administrative Claims previously have been or will be satisfied in the ordinary course of business prior to or within ten (10) days of the Effective Date of the Plan. To the extent any claims are subsequently allowed as Administrative Claims, Debtor expects to have funds available from future receipts to pay such claims. Therefore § 943(b)(5) is satisfied.

### SECTION 943(b)(6) IS SATISFIED.

Section 943(b)(6) requires regulatory or electoral approval for any action to be taken under the plan that would require such approval in the absence of the chapter 9 case. With respect to electoral approval, a key element of the Plan is the assumption by Barnwell County of the

Debtor's obligations for the Pension Plan. The former employees covered by the Pension Plan are Class 3 creditors and are an unimpaired class based upon the assumption of the Pension Plan obligations by Barnwell County. The Plan contemplates the approval of an ordinance by Barnwell County to assume this obligation and conditions the Plan upon such approval ("Pension Plan Ordinance"). The Modification clarifies that this condition cannot be waived. The ordinance approving the assumption of the liability was approved by Barnwell County on May 9, 2012. [Doc. No. 208]. There are no regulatory approvals or other electoral approvals needed for any action to be taken under the Plan. Accordingly, § 943(b)(6) is satisfied.

THE PLAN IS IN THE BEST INTEREST OF CREDITORS AND IS FEASIBLE IN ACCORDANCE WITH § 943(b)(7).

██ The final requirement for confirmation of a plan in a chapter 9 case is that the plan "is in the best interests of creditors and is feasible." 11 U.S.C. § 943(b)(7). The analysis included in the Plan, the Plan Confirmation Brief, and the other evidence related thereto, submitted and adduced at or prior to the Confirmation Hearing: (a) are reasonable, persuasive and credible; (b) have not been controverted by other evidence; and (c) establish that the Plan affords all creditors the potential for the greatest economic return from Debtor's assets. Therefore, it is in the best interest of creditors, especially given the complex nature of this case. It appears that the Debtor has obtained a fair price for its assets under the APA, and the Plan will therefore result in satisfaction of certain of Debtor's secured debts, the payment of Allowed Administrative Claims, and a distribution to unsecured claims, albeit over time. By implementing the APA, the Debtor will be able to convey its hospital assets as a going concern. As a going concern, the value of the Debtor's assets, although small, is enhanced by several factors, including the experience and talent of employees, the value of assembled contracts and equipment, and the connections of the business to the community and other providers. The Plan allows the Debtor to realize that value and distribute it to its creditors.

In the absence of the Plan or a change of the Barnwell County Council's expressed determination to further reduce or eliminate the level of funding support for the Hospital, the Debtor does not have sufficient revenue to keep the hospital operating long term. Therefore the hospital would eventually have to shut its doors and close down completely. Without operating, the value of the Debtor's assets would consist of only the value of used equipment and receivables, which would likely not be distributed to creditors pro rata. Instead, those creditors able to pursue litigation most quickly would benefit at the expense of others. Finally and of particular importance to the Court is that the Plan preserves the availability of healthcare services to citizens and patients in the County.

██ Under the Plan, the ability to make the payments required by the Plan turns on the ability of RHS, the Debtor, the Barnwell County Hospital, and the Counties to close the APA, and on collection of the outstanding accounts receivable.

RHS has placed no less than $1,500,000.00 on deposit in escrow, earmarked for its financial obligations relative to closing the APA and has presented evidence at the Confirmation Hearing of the

financial wherewithal of it and its sponsor, Dobbs Equity Partners, LLC, with respect to funding the ongoing operation of the hospital in accordance with the APA and Development Agreement.

Accordingly, the Plan is in the best interests of creditors and is feasible.

### SATISFACTION OF CONFIRMATION REQUIREMENTS.

Based on the foregoing, the Plan satisfies the requirements for confirmation set forth in § 943(b) of the Bankruptcy Code.

### LIKELIHOOD OF SATISFACTION OF CONDITIONS PRECEDENT TO EFFECTIVENESS.

Each of the conditions precedent to effectiveness, as set forth in Article IX.C. of the Plan, has been satisfied or waived in accordance with the provisions of the Plan, or is reasonably likely to be satisfied.

### MODIFICATIONS TO THE PLAN.

Subsequent to solicitation, the Debtor made certain modifications to the Plan. All modifications to the Plan since the entry of the Solicitation Procedures Order are consistent with all of the provisions of the Bankruptcy Code, including, but not limited to, §§ 942 and 1127(d) of the Bankruptcy Code, the Federal Bankruptcy Rules, including Rule 3019, and the Local Bankruptcy Rules. None of the modifications made since the commencement of solicitation adversely affects the treatment of any creditor or equity security holder under the Plan. Accordingly, pursuant to § 1127(a) of the Bankruptcy Code, none of the modifications require additional disclosure or resolicitation, and under Rule 3019, creditors are deemed to have accepted the Plan as modified.

### THE PEEPLES' OBJECTIONS.

Rodney A. Peeples, a retired state trial judge, represented his brother Robert Peeples, a Class 2 unsecured creditor and several of the vested participants in the Barnwell Hospital Pension Plan, who are dealt with in Class 3 and assumed by the Barnwell County by County Ordinance No. 2012–5–281, in connection with the confirmation of the plan before the Court. Judge Peeples did so *pro bono* and in a most genteel and collegial fashion given the politically divisive nature of the very important community healthcare issues involved. In many ways he was the voice for those that disagree with County Council's decision to reduce and ultimately end funding of the public hospital and for future patients that might prefer a public rather than a private hospital system.

The bankruptcy and business lawyers who, by nature, view cases as another deal to be done sometimes seemed uncertain of the purpose, relevance, or importance of counsel's wide-ranging objections. On occasion Hospital administrators, County Council members, and representatives of RHS seemed offended by the policy questions posed and by the suggestions of a better way or a different purpose. These witnesses clearly felt they had given their best efforts and devoted their best judgment to problems they viewed as demanding change. The efforts of counsel, however, clearly led to a fuller public airing of the plans for healthcare in the region and exposed the imperfection of systems, current and future, for delivering healthcare services. The decisions are of some moment and there should be no surprise to find differences of opinion about solutions and even the existence of a problem. Public confidence in chapter 9 debt adjustments benefits as a result of the consideration of all of the views.

The objections fall into four principal categories: 1) a lack of documents or in-

formation to support the need for a change and thus the propriety of the proposed plan; 2) the wisdom or fairness of the County Council's funding decisions over the years by which limited financial resources have been allocated other than to the Debtor; 3) the intentions of those involved in decision making regarding the current status of the Hospital and its assets; and 4) the feasibility of the proposed plan as it affects the continued provision of health services to the citizens.

This case, though pending only seven (7) months, and its companion case, the Bamberg County Memorial Hospital, Case No. 11–3877, which has been pending slightly more than ten (10) months have generated a large volume of documents. The Disclosure Statements, Plans, APA and assorted schedules or attachments are daunting. Counsel for the objecting parties notes that the APA arrived in three binders. There are 200+ docket entries in each case and numerous exhibits at confirmation. Despite this counsel notes that there are exhibits he requested, both through informal discovery and under the state Freedom of Information Act, that have not been received and considered as a part of confirmation. The Court has carefully considered the Plan and the APA, to the degree it implements the Plan's proposal for sale of the Hospital, and is satisfied that, based on the information presented at the confirmation hearing, that there is adequate support of the Court's findings that the confirmation requirements of the Bankruptcy Code are met.

The Peeples' objections contend that the lack of audited financial statements after 2009, the decisions to purchase expensive medical equipment that will now be transferred to RHS, and the scheduling of 800 or so accounts payable that in large part reflect minor refunds due to former patients belie an effort to paint a dismal financial picture of the Hospital to justify a sale. It is certainly true that audits have not been completed and that large sums have been expended out of operating income to purchase equipment that will be transferred to the purchaser. It is also the case that valuable assets in the form of land, buildings, and equipment will be transferred from Barnwell County into private hands without the usual consideration of the payment of some version of fair market value.

The objection ignores, however, the County Council's decision to extricate itself from future long-term financial obligations to a Hospital that, for whatever reason, under-serves the citizens of Barnwell County. There was credible testimony that, due to the availability of more specialized care outside the county, the beds at the hospital go unused while the residents seek care elsewhere. This left the Debtor to provide ongoing emergency room care to stabilize critical injury or disease and address the usual visits to the emergency room which are not truly emergency in nature but reflective of an indigent population's use of the emergency room as a family medicine alternative. The Debtor did also provide on-going diagnostic services of a limited scope but had lost other specialty care emphasis as physicians departed and recruitment of doctors became more difficult.

Finally, the remaining issues largely go to the decisions of the County Council to not fund the Debtor as in prior years and ultimately to the policy decision to remove itself from the healthcare business by transfer of the Hospital's assets into private hands, even at the cost of fairly significant future financial obligations for infra-

structure in the event a new hospital is built by the purchaser as anticipated by the Plan and APA. The Court views these issues only through the prism of the Bankruptcy Code's good faith requirements and not to substitute its views for the policy and business decisions made by the local government authority to which they are properly entrusted. The Court makes no determination as to which of the myriad of options for healthcare is best for this community but rather looks to the requirements for plan confirmation imposed by the Bankruptcy Code and met by the Debtor in this case.

The Board and the County Council are properly charged with the duty to make decisions concerning the Hospital. County Council members are elected by the citizens of Barnwell County and are entrusted with the responsibility to govern. The Court's duty in this case is to ensure that the Debtor has complied with the requirements of the Bankruptcy Code in proposing and advocating a chapter 9 debt adjustment plan, not to substitute its business or political judgment in place of the plan proponent; those the people have elected. Whether healthcare for the residents of Barnwell County is improved by the decisions of County Council rests not simply on the path chosen in the chapter 9 plan but on events yet to unfold. Council exercised its judgment based on present circumstances, tax revenue and local budget projections, and an uncertain healthcare future. The accuracy of the forecast waits for another generation. The plan and the case were filed in good faith.

### ORDER

Based on the foregoing findings of fact and conclusions of law, it is Ordered, Adjudged, and Decreed that:

### CONFIRMATION OF PLAN.

The Plan is **APPROVED** and **CONFIRMED** under the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, including without limitation pursuant to § 943(b) of the Bankruptcy Code. The Plan is valid and enforceable pursuant to its terms and the terms of the Plan are incorporated herein by reference and are an integral part of this Confirmation Order.

### OBJECTIONS.

With respect to the filed objections to confirmation of the Plan, the only objections which remained at the conclusion of the Confirmation Hearing were the objections of Alexander, Peeples, and GE. With respect to the objection filed by Alexander, Alexander challenges only whether Debtor is eligible to be a chapter 9 Debtor. The Court has concluded that Debtor meets the eligibility requirements. With respect to the objection of Peeples, the Court has considered each objection raised therein and the Debtor's responses thereto including at the Confirmation Hearing. The Bankruptcy Court hereby overrules the Peeples' objections, and as set forth more fully herein, finds that the Plan satisfies the elements of the Bankruptcy Code as set forth above, including § 943(b), and should be confirmed.

As to the other filed objections:

a. The objection of Nexsen Pruet was withdrawn during the Confirmation Hearing.

b. Counsel for Debtor advised the Court that the objections of Palmetto were resolved and would be addressed in connection with a pending Motion to Assume or Reject the Contracts of Palmetto.

c. The objections of Creekridge and HHS have been previously discussed in

this Order as being resolved by the Modification.

d. GE opposed confirmation based upon the potential impact on unsecured claims if the Pension Plan Ordinance was not adopted by Barnwell County. This issue has been addressed by the adoption of the Ordinance as previously discussed in this Order. Consequently, the GE objection is overruled.

## Findings of Fact and Conclusions of Law.

The findings of fact and the conclusions of law stated in this Confirmation Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by this Bankruptcy Court on the record in connection with Confirmation of the Plan or otherwise at the Confirmation Hearing are incorporated herein by reference. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and vice versa. To the extent that any of the findings of fact or conclusions of law constitutes an order of this Bankruptcy Court, they are adopted as such.

## Approval of Plan Documents.

Upon the Effective Date, all actions contemplated by or in furtherance of the Plan shall be deemed authorized and approved in all respects.

The terms of the Plan and exhibits thereto are incorporated by reference into, and are an integral part of, the Confirmation Order. The form and substance of the Plan (and exhibits thereto), along with such further provisions as are provided herein, are confirmed and approved in each and every respect pursuant to § 943

of the Bankruptcy Code. Except as may be set forth in the Plan, the Debtor is authorized and empowered to make any and all modifications to any and all documents included as part of the Plan that may be agreed to by the parties thereto and that are consistent with and in furtherance of the terms of the Plan and the terms of this Confirmation Order.

## Authority.

The Debtor and its respective directors, officers, managers, agents, representatives, and attorneys, are authorized and empowered to (a) issue, execute, deliver, file and record, as appropriate, any contracts, instruments, releases, indentures, bills of sale, assignments, leases or other agreements or documents and (b) perform such other acts and execute and deliver such other documents as are required by, consistent with and necessary or appropriate to implement, effectuate or consummate the Plan and this Confirmation Order and the transactions contemplated thereby and hereby, all without the requirement of further application to, or order of, the Bankruptcy Court.

## Injunctions and Releases.

Subject to the occurrence of the Effective Date and pursuant to applicable law and § 944 of the Bankruptcy Code, the discharge of the Debtor and any of its assets or properties, the releases, the injunction provisions and the exculpation provisions each as provided in Article X of the Plan, are (a) deemed incorporated in this Confirmation Order as if set forth in full herein, (b) hereby approved and authorized in their entirety as an integral part of the Plan and (c) hereby deemed and held to be fair, equitable, reasonable and in the best interests of the Debtor and its creditors. Except as otherwise specifically provided in the Plan (and except as

may be necessary to enforce the provisions of the Plan or remedy a breach of the Plan), this Confirmation Order acts as of the Effective Date as a full and complete discharge of all Claims against the Debtor, the post-Effective Date Debtor, or the post-Effective Date Debtor's assets of any nature whatsoever, including, without limitation, any liability of a kind specified in §§ 502(g), 502(h) or 502(i) of the Bankruptcy Code, that arose or have been asserted against the Debtor at any time before the entry of the Confirmation Order or that arise from any pre-Confirmation conduct of the Debtor whether or not the Claim(s) are known to or knowable by the holder of a Claim.

NOTICE OF ENTRY OF THE CONFIRMATION ORDER.

In accordance with Bankruptcy Rules 2002 and 3020(c), within ten business days of the date of entry of the Confirmation Order, the Debtor shall serve the Notice of Entry of the Confirmation Order ("Notice of Confirmation") by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties having been served with the Confirmation Hearing Notice; provided, however, that no notice or service of any kind shall be required to be mailed or made upon any party to whom the Debtor mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such party of their new address. Mailing of the Notice of Confirmation in the time and manner set forth in this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of the Bankruptcy Code,

Bankruptcy Rules, and Local Bankruptcy Rules, including Bankruptcy Rules 2002 and 3020(c), and no other or further notice or publication is necessary.

The Notice of Confirmation shall have the effect of an order of the Bankruptcy Court, shall constitute sufficient notice of the entry of the Confirmation Order to such filing and recording officers, and shall be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

REFERENCES TO PLAN PROVISIONS.

The failure specifically to include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety.

APPLICABLE NON-BANKRUPTCY LAW.

Pursuant to Bankruptcy Code §§ 1123(a) and 944(a), the provisions of this Confirmation Order, the Plan or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law. Debtor is not otherwise prohibited by law from taking any action necessary to carry out the Plan as required by § 943(b)(4).

GOVERNING LAW.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of South Carolina, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or en-

tered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters.

EFFECTIVENESS OF ALL ACTIONS.

Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan or this Confirmation Order shall be effective on, prior to, or after the Effective Date pursuant to the Confirmation Order as applicable, without further application to, or order of, the Bankruptcy Court, further act or action under applicable law, regulation, order, or rule or vote, consent or authorization, or further action by the respective officers, directors or members of the Debtor and with the effect that such actions had been taken with the consent and by unanimous action of such officers, directors or members. In addition to the authority to execute and deliver, adopt, assign and/or amend, as the case may be, the contracts, instruments, releases and other agreements specifically granted in this Confirmation Order, the Debtor is authorized, and empowered, without necessity of action of their respective officers, directors or members, to take any and all such actions as any of their executive officers may determine are necessary or appropriate to implement, effectuate, and consummate any and all documents and/or transactions contemplated by the Plan, and/or this Confirmation Order.

WAIVER OF STAY OF BANKRUPTCY RULE 6004(H) AND 6006(D).

Notwithstanding Rules 6004(h) and 6006(d) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan. The Court finds cause to enter this order regarding the stay provided by Rules 6004 and 6006 and finds that the respective stays should not be applicable in this case based upon the showing at the confirmation hearing that the sale and the assumption, rejection, or assignment of unexpired leases and executory contracts should occur upon entry of this order, or as soon thereafter as is practical, given the financial constraints faced by Debtor and the need to expedite the transfer of assets to RHS.

MODIFICATION OF THE PLAN PRIOR TO CONSUMMATION.

Subject to certain restrictions and requirements set forth in §§ 942 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, after the Confirmation Date and prior to consummation of the Plan, the Debtor may: (a) amend or modify the Plan one or more times as may be necessary to carry out the purposes and effects of the Plan so long as such amendment(s) do not materially and adversely affect the treatment of any creditor or equity security holder under the Plan and (b) institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or this Confirmation Order. Entry of the Confirmation Order means that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to the Bankruptcy Code, including § 942, the Bankruptcy Rules, and the Local Bankruptcy Rules, and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

FINAL CONFIRMATION ORDER.

This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof. Notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan.

RETENTION OF JURISDICTION.

This Bankruptcy Court's retention of jurisdiction as set forth in Article XIII of the Plan is approved. Such retention of jurisdiction does not affect the finality of this Confirmation Order. For the avoidance of doubt, the Bankruptcy Court shall retain jurisdiction over all pending matters.

AND IT IS SO ORDERED.